DOUGLAS PAGE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Page v. Commissioner
Docket No. 3670-91
United States Tax Court
T.C. Memo 1993-398; 1993 Tax Ct. Memo LEXIS 407; 66 T.C.M. (CCH) 571; August 30, 1993, Filed *407 Decision will be entered under Rule 155. For petitioner: Kenneth E. Keate. For respondent: Jack Forsberg. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies of $ 20,126 and $ 11,130 in petitioner's Federal income tax for 1984 and 1985. Respondent also determined additions to tax, as follows: Internal Revenue
1984
1985
Code Sec. Tax Year
Tax Year
6651(a)(1)
[1] $ 5,032
[1] $ 2,783
6653(a)(1)
1,006
557
6653(a)(2)
[2]   [2]   6654(a)
1,265
638
6661
5,032
2,783
6621(c) [4]
[3]   [3]   Respondent also moved for a penalty under section 6673. *408 All section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. The issues in this case concern petitioner's relationship to his professed charitable organization (church) and its effect upon whether income earned by petitioner's efforts is taxable to him or whether petitioner is entitled to charitable deductions for those amounts. We also consider the amount of petitioner's income and whether he is entitled to certain deductions in connection with his consulting and engineering activity and to itemized deductions for attorney's fees, interest, and real estate taxes. Finally, we consider whether petitioner is liable for various additions to tax, increased interest, and/or a penalty under section 6673. FINDINGS OF FACT [1]
Petitioner had his legal residence at 15817 Valley View Road, Eden Prairie, Minnesota (Valley *409 View property), at the time of the filing of his petition in this case. Petitioner, a high school graduate who completed 3 years of college, is an ordnance engineer. During 1984 and 1985 petitioner resided at the Valley View property. Petitioner purchased the Valley View property in 1974. Petitioner was married to Carolyn Page (Carolyn) from 1974 until their divorce on October 25, 1984. Carolyn, along with two children, resided in California during 1984 and 1985. Under an October 25, 1984, divorce decree, petitioner was entitled to custody of the children for 3 months each summer and for alternate birthdays, Easters, Thanksgivings, and Christmas/New Years. Petitioner paid child support of $ 225 per month for 9 months each year. These payments were made by traveler's checks, postal money orders, and checks from Kathleen Grossinger's (Grossinger) personal checking account, for which petitioner reimbursed Grossinger. Petitioner also paid the children's transportation expenses to and from his residence. During May 1978, petitioner, along with Carolyn and Jon Frayne (Frayne), formed Chapter 8035 of the Basic Bible Church of America (Chapter 8035), and petitioner purportedly took *410 a vow of poverty irrevocably transferring his property to Chapter 8035. On August 18, 1978, petitioner and Carolyn transferred the Valley View property to themselves in joint tenancy, with right of survivorship for the expressed benefit of Chapter 8035. Chapter 8035 was unsuccessful in attempting to obtain exemption from real estate tax in Minnesota or to attain tax exempt status in Minnesota. The Minnesota Tax Court, in a Judgment rendered April 21, 1980, denied an exemption, concluding that the Valley View property was not owned by a church and was not being used primarily for religious or church purposes. That judgment was affirmed by the Minnesota Supreme Court on June 3, 1981. The American Fundamentalist Church (AFC), a successor entity formed by petitioner and his associates, also sought exemption of the Valley View property from real estate taxes. That request was also denied and confirmed by the Minnesota Tax Court on March 22, 1983. AFC was not affiliated with any other church or denomination. The Basic Bible Church of America, as promoted by Jerome Daly and William Drexler, was a tax protest and tax-avoidance scheme. Because of disagreement with certain of the goals *411 of the promoters of the Basic Bible Church of America, petitioner, along with a few others, converted Chapter 8035 into the AFC during 1980. A "Certification of Ordination", dated January 1, 1980, declared petitioner to be an ordained minister of AFC. Around July 7, 1980, petitioner, Carolyn, and Jon L. Frayne (Frayne) executed a "Certificate of Incorporation of the American Fundamentalist Church". That certificate was amended by an October 29, 1980, document, executed by Carolyn, Frayne, and petitioner, which, among other statements, contained the following: the Church * * * shall have the power * * * to establish a Board of Trustees, which shall be the governing body of the non-secular and business aspects of the Church's operation, which shall include appointment of the Head of the Church, who shall serve at the pleasure of the trustees. * * * The location of the Church shall be 15187 Valleyview [sic] Road, Eden Prairie, Minnesota 55344. * * * The corporation shall be managed by the Board of Trustees in all its business affairs, which Board shall be composed of not less than three nor more than seven natural persons, all of whom shall be members of the Church. *412 * * *
The named trustees of AFC from January 1 to February 3, 1984, were petitioner, Grossinger, Jerold Peterson (Peterson), and Ray Hartman (Hartman). From February 3, 1984, to January 7, 1985, Hartman was no longer named, and the other three were unchanged. For the remainder of 1985 Frayne was added and the other three continued unchanged. The "emergency trustees" were Sanford Brigadier of Atlanta, Georgia, and Stephen Page (petitioner's brother) of Oregon. Petitioner and/or others caused AFC to be listed as a nondenominational church in the telephone directory and on the church directory posted in hotels and local newspapers. During 1984 and 1985 petitioner and Grossinger had an intimate relationship. Grossinger, on occasion, resided at the Valley View property. Peterson has known petitioner since 1979 or 1980 and occasionally stayed at the Valley View property. Peterson, during 1984 and 1985, did not have a permanent residence and did odd jobs, including painting and selling telephones, but did not file Federal income tax returns for 1984 and 1985. During 1984 and 1985 the "ministerial duties" of the AFC were successively performed by petitioner, Peterson, and Frayne. *413 The succession occurred because petitioner was away performing services as an ordnance engineer. Although Peterson and Frayne were described as performing ministerial duties, unlike petitioner, they did not receive any compensation or a residence. Trustees meetings were held on the first Friday of each month and minutes were maintained. Petitioner, Grossinger, and Peterson attended all 24 meetings during 1984 through 1985. Hartman attended three in 1984 and none in 1985. Frayne attended no meetings in 1984 and all 12 in 1985. The topics discussed and recorded in the minutes of the trustees' meetings were substantially concerning tax matters, tax and nontax litigation, hiring and paying attorneys, and plans for "retaliation" against various Government officials. Some illustrative excerpts from the minutes, include: [April 6, 1984] Rev. Page gave a full accounting of the legal battles to date including the ones concerning the methods by which the Church raises money and the subsequent assignment of church income to Rev. Page. * * * Church records concerning fund raising by other church members are to be destroyed to prevent a similar punitive assessment to them by *414 the IRS - this by unanimous vote of the trustees. [July 6, 1984] * * * Rev. Page gave a financial report and discussed plans to phase out all bank accounts in order to assure complete financial privacy for the church and to prevent the feds from using financial data found in accounts as a means or basis for illegal and unlawful assessment of church members. It was pointed out that the IRS attempts to assign church funds as income to members and then attempts to assess the members for tax on those assigned income figures. Apparently the only basis they have for this is financial data stemming from bank accounts. * * *
Petitioner did not maintain a checking account in his own name during 1984 and 1985. During September 1980 petitioner opened a checking account in AFC's name with signature authority in petitioner's and Carolyn's name. Petitioner and Carolyn became separated and, around June 1, 1982, Carolyn's signature authority was canceled, and Grossinger's signature authority to withdraw funds was added. Around April 24, 1984, Peterson's signature authority was added to the account in AFC's name. For 1984 and 1985, respondent reconstructed petitioner's income by tabulating *415 all deposits to the AFC account and reducing them by the amount of any nontaxable amounts. To the resulting amounts, respondent added the child support payments that petitioner made under the divorce decree from Carolyn. The total of those two items constituted the reconstructed income of petitioner for 1984 and 1985. During 1984 and 1985 deposits to the AFC checking account totaled $ 52,116.86 and $ 34,046.68, respectively. Ten checks totaling $ 8,536.63 in 1984 and eleven checks totaling $ 6,873.50 in 1985 were deposited and can be identified as drawn by Action Manufacturing (Action), Technical Advisory Services, Inc. (TASA), or Michael Pangia, all of which represented petitioner's sources of income and/or payment or reimbursement for petitioner's expenses. Also, petitioner earned $ 50 during 1984 for officiating at a wedding. Unidentified checks and money orders in the amounts of $ 15,530.23 (represented by 16 items) for 1984 and $ 174.18 (represented by 5 items) for 1985 were also deposited. Deposits of currency and unidentified wire transfers were made in the amounts of $ 28,050 (represented by 18 items) for 1984 and $ 27,000 (represented by 28 items) for 1985 were deposited *416 to the AFC account. Respondent determined that all of these amounts represent income to petitioner. Petitioner agrees that $ 2,506.56 and $ 6,873.50 of checks from TASA in 1984 and 1985, respectively, represent payments for consulting services rendered by petitioner and/or reimbursement or payment of expenses. Petitioner also agrees that $ 6,316.26 of checks from Action during 1984 were for petitioner's services and/or reimbursement or payment of expenses. Petitioner agrees that these amounts from TASA and Action represent self-employment income to him. Respondent concedes that the following items deposited to the AFC account are nontaxable: Amount Item
1984 1985
Pennsylvania Bell
$ 49.23
-- General Motors Accept. Corp.
1.55
-- Minneapolis Star & Tribune
13.20
-- Eveready
-- $ 1.00
Totals
63.98
1.00
Additionally, $ 250 of the 1984 deposits was not taxable, but instead represented reimbursement for a stolen firearm. During 1984 and 1985 no checks were drawn for cash and no cash was withdrawn from the AFC account. Petitioner received no inheritances or substantial gifts or sold any assets during 1984 or 1985. Currency was maintained in a *417 "cash fund" which was secured in two lock boxes. One lock box usually held $ 400 to $ 500 in cash and was kept at the Valley View property. The other held larger amounts of cash and was kept at various locations, including the Valley View property on occasion. Food consumed by petitioner and his family was purchased by Grossinger with cash from the cash fund. During the summer months, when petitioner had custody of his children, $ 100 per week was spent on food. At other times about $ 50 per week was spent on food. Expenses incurred by petitioner in his consulting activity, with the exception of a $ 116.35 check in 1984, were paid in cash. During 1984 and 1985, petitioner attempted to structure employment relationships between himself and his clients in a manner reflecting that the client had contracted with AFC. Petitioner's intent in structuring the transactions in that manner was to avoid tax liability for income earned by him in the business relationship with his clients. In pursuing this approach, petitioner consulted with and used sample contracts provided by attorney Joe Mannikko. Attorney Mannikko also represented petitioner in connection with his purchase of the *418 Valley View property. The contracts were structured so that petitioner was to act as an agent of AFC in performing ordnance work and were signed by petitioner on behalf of AFC. Petitioner now concedes that those assignments were not valid assignments of income for Federal income tax purposes. During 1983, while petitioner was performing services in Pennsylvania, he opened a bank account in Lancaster, Pennsylvania, in the name of "AFC, Inc." at the Fulton Bank. Petitioner used that account to pay his living expenses that he incurred while performing services for Action. That account was closed in 1984 after petitioner completed his work for Action. Petitioner did not have any automobiles registered in his name, but a Cadillac, Volkswagen, Firebird, and Chevrolet pick-up truck were titled and/or registered in the name of AFC. Petitioner had the use of those automobiles and also the use of Grossinger's Mustang, and the operating expenses for all of these automobiles were largely paid from the cash fund. Monthly bills for all utilities for the Valley View property were paid from the AFC account. The Valley View property was about 30 years old, and during 1984 and 1985 painting *419 and/or substantial repairs were made to the residence and garage, including roofing, gutters, and soffits. In addition, about 20 to 25 dead elm trees had to be cut and removed. The cost of these repairs and replacements was paid out of the cash fund. Valley View had been purchased under a contract for deed, which had a November 12, 1983, balance due of $ 6,604.99. That balance was paid off during 1983 in substantial part by means of a $ 6,000 loan from petitioner's mother. The loan was evidenced by a note and signed "American Fundamentalist Church By: Rev. Douglas Page, D.D., Kathleen J. Grossinger, Sec. Treas." and provided for monthly payments with 8-1/2 percent interest, beginning December 15, 1983. During 1984, nine checks totaling $ 5,064.92 were paid to petitioner's mother from the AFC account. During 1985 a $ 750.14 check was paid to petitioner's mother from the AFC account. The note to petitioner's mother was secured by a carved ivory figurine, a warrior empress, a souvenir sword, a teak Chinese writing desk (circa 1820-1830), and a teak straight back chair, which were all antiques petitioner purchased prior to 1980. When petitioner had executed his Vow of Poverty *420 in connection with Chapter 8035, he had supposedly transferred the antiques to Chapter 8035. Following the unsuccessful attempt to gain exemption from real estate tax on the Valley View property, 4 years' taxes, special assessments, interest, and penalties totaling $ 13,718.63 were assessed and paid during May 1984. The $ 13,718.63 total was composed of ad valorem tax of $ 9,096.48, special assessments of $ 1,550.44, interest of $ 1,581.15, and penalties of $ 1,490.56. The payment was made with a $ 12,200 check which had been deposited in the AFC account and a loan of $ 1,519.63 from Grossinger, which was repaid in part by a $ 400 cash payment. During 1985, attorney Randall Tigue represented petitioner before this Court concerning petitioner's 1979 through 1982 taxable years. Attorney Tigue was paid a $ 4,025 fee during 1985 from the AFC account. Petitioner was also represented by attorney Jeff Lambert during 1984 in connection with his divorce from Carolyn, but no payments were made from the AFC account concerning that representation. Additionally, the minutes of the AFC trustees meetings reference: Litigation against a bank and bank officer who declined to cash checks made *421 out to AFC; Freedom of Information Act proceedings with respect to the Minnesota Department of Revenue, the U.S. Postal Service, the Internal Revenue Service, and the Social Security Administration; and a discrimination action filed in U.S. District Court. Minutes of a June 1, 1984, AFC trustees' meeting state the following: The church security advisor gave a report of the surveillance of certain IRS agents. It was made clear that the proper type of surveillance will yield enough evidence to indict certain agents for conspiracy to violate our civil rights. There have been direct conversations between the State and Federal IRS agents concerning a concerted effort to drive the AFC out of action and levy heavy assessments against its principal fund raisers. The board has voted to take appropriate action. The board voted $ 50,000 to cover the cost of retaliation.
During 1973, petitioner purchased a Cessna Model 177 airplane for $ 9,450, including accessories. Petitioner executed documents indicating that he had transferred the airplane to Chapter 8035 during 1980. During 1984 and 1985, expenses for storage, maintenance, and insurance were paid from the AFC account. *422 During the years in issue, petitioner was the only person associated with AFC who could fly an airplane. The following summary reflects the category and year of payments made out of the AFC account: Total Payment to Payee
Category/Payee
1984 1985 Airplane
Airguide publications
$   24.37
$   24.37
Burlington Northern Airmotive
270.36
-- Clayton Bangs (hanger)
-- 360.00
John Berlin (mechanic)
-- 60.00
Les Johnson (hanger)
655.00
420.00
Pioneer Agency, Inc. (insurance)
550.00
116.00
Sundance Leasing (mechanic)
60.00
-- Legal fees
Barry Fisher
2,500.00
-- Joe Mannikko
9,250.00
5,500.00
Rosenthal & Rondon
-- 100.00
Robert Spector
1,000.00
7,600.00
Randall Tigue
-- 4,025.00
Vehicles
Auto Owners Insurance
384.26
-- Driver Vehicle Service Div.
70.50
91.75
Dune Buggy Supply
157.48
-- Mobile
20.00
8.00
Miscellaneous
Artistic Greetings, Inc.
1.35
Bank Card Center (credit card)
-- 629.25
Church Directory Service
23.00
24.00
E.P. Crime Prevention Fund
-- 25.00
Eden Prairie News
-- 10.00
First Minnetonka Bank
(charges and checks)
33.34
36.40
First Minnetonka Bank (wire
transfer)
10,010.00
-- Minneapolis Star & Tribune
273.80
-- Pennsylvania Power & Light
116.35
-- Printing Press
128.00
-- RCA Service Co.
24.95
-- Superintendent of Documents
30.00
29.00
Trustees & related parties
Grossinger
1,700.00
4,700.00
Hartman
1,135.82
-- Petitioner
3,770.02
-- Petitioner's mother
5,064.92
6,260.14
Valley View property
AT&T (telephone)
55.32
88.79
Centraire (heating & cooling)
99.75
Church Mutual (insurance)
1,338.78
851.78
City of Eden Prairie (water)
74.21
106.13
Eden Prairie Trashtronics
21.00
-- First Minnetonka (cashiers check --
real estate tax assessment
12,200.00
-- Minnegasco (natural gas)
1,134.03
937.24
Northwestern Bell (telephone)
295.33
321.65
Northern States Power (electric)
506.47
547.66
Record-A-Call (repairs)
-- 39.95
Republic Telecom (telephone)
859.93
750.26
S&B Salvage, Inc. (shelving)
82.00
-- Sears
38.14
-- *423 For 1984 and 1985, petitioner filed Federal income tax returns reflecting gross income figures of $ 5,270 and $ 5,525, respectively, which were composed of the following categorized components: Item 1984
1985
Stipend
$ 5,150
$ 5,400
Use of auto
120
125
Totals
5,270
5,525
No other income or deductions (business or itemized) were reported on the 1984 and 1985 income tax returns. Petitioner's 1984 return reflected no tax due, and his 1985 return reflected a $ 239 tax liability. Petitioner claimed estimated payments of $ 2,301 in both years and overpayments or refunds for each of the taxable years 1984 and 1985. In fact, petitioner, for 1984 and 1985, did not file Declarations of Estimated Tax (Forms 1040 ES) or make any deposits of estimated tax. No tax was withheld from petitioner's earnings for 1984 and 1985. OPINION A. Background
This is petitioner's second controversy in this Court concerning whether his relationship to his "church" would permit avoidance of taxation on income generated by his personal services. See Page v. Commissioner, T.C. Memo. 1986-275, affd. 823 F.2d 1263 (8th Cir. 1987), *424 cert. denied 484 U.S. 1043 (1988) (Page I). In Page I petitioner argued that his relationship with his "church" placed him in a position which would permit him to pay little or no tax on income earned for his services. He argued, alternatively, that he was either an agent of his "church" so that the income was not taxable to him but to his "principal", or that he was entitled to deduct as charitable contributions any income donated to his "church". Respondent contended that petitioner earned the income individually and not as an agent and/or that petitioner was not entitled to deductions for charitable contributions because petitioner's "church" was not an organization of the type described in section 170(c)(2). Petitioner was unsuccessful in Page I and the essence of our holding was: Although petitioners in this case were more meticulous in their execution of pro forma and other documents and in organizing and operating their "church," it is abundantly clear that substantially all of the "earnings" of the "church" inured to their benefit and that of their family. Petitioner caused it to, in form, appear that he had no control over the "church" *425 funds or bank accounts, but in reality he retained and exercised control over all money and property involved. * * * [T.C. Memo. 1986-275.]
Page I involved 1979 [2] through 1982, and this case involves the same entities and individuals for 1984 and 1985. Petitioner argues that several features in this case are distinguishable from the facts of Page I. As a matter of law, however, petitioner advances no new theories or criticism of the rationale of Page I. B. The Amount of Unreported Income -- Reconstruction by Means of Bank Deposits
A significant difference between this case and Page I is respondent's methods of determining the amount of petitioner's income. In Page I, respondent was able to identify specific sources of petitioner's income. In this case, respondent can specifically identify only a limited amount of the total deposits to the *426 AFC bank account during 1984 and 1985. The reason for respondent's disability is to be found in petitioner's modus operandi. In Page I, petitioner deposited checks from his clients into the bank account. During the years under consideration here, petitioner began using cash instead of check deposits to thwart attempts by taxing authorities to identify the source or recipient of specific funds or revenue. Petitioner agrees that the amounts specifically identified by respondent constitute gross income to petitioner from self-employment. Respondent determined that the remainder of the AFC bank deposits were income to petitioner, with the exception of items which have been conceded or stipulated as being from a nontaxable source. Petitioner contends that the remainder of the deposits fall into three possible categories: (1) Contributions to AFC, (2) deposits from nontaxable sources, such as loans from petitioner's mother, and (3) receipts from the sale of the airplane from which petitioner's basis must be subtracted to determine the gain. It is a well-established principle in the tax law that respondent may utilize methods to reconstruct a taxpayer's income. Holland v. United States, 348 U.S. 121 (1954). *427 Respondent is entitled to use a reconstruction method where a taxpayer has no books and records or inadequate books and records. Holland v. United States, supra; United States v. Johnson, 319 U.S. 503 (1943); Campbell v. Guetersloh, 287 F.2d 878, 880 (5th Cir. 1961); Adamson v. Commissioner, 745 F.2d 541 (9th Cir. 1984); Keogh v. Commissioner, 713 F.2d 496 (9th Cir. 1983); United States v. Stonehill, 702 F.2d 1288 (9th Cir. 1983). In this case the record reflects that petitioner and the other "trustees" of AFC went to great lengths to secrete their activities and/or to "retaliate" against the taxing authorities. Petitioner also attempted to devise consulting contracts where the income was shown as attributable to an entity other than himself, even though the income was earned by his personal services, a point he now concedes. In any event, petitioner's lack of records, whether intentional or involuntary, is a sufficient basis for respondent's use of a method of reconstruction. This, coupled *428 with petitioner's income concession showing that there was a source of unreported income, leaves the burden of going forward as well as the ultimate burden of proving respondent's determination to be in error squarely upon petitioner. Rule 142(a); Welch v. Helvering290 U.S. 111 (1933). Petitioner argues that during 1984 two deposits are either totally or partially [3] not subject to tax. Petitioner contends that $ 12,200 represents the sales proceeds of the airplane petitioner had originally purchased during 1973 and that the $ 10,010 wire transfer is a loan from his mother. Respondent argues that these amounts do not represent a sale or loan, but instead represent unreported income which petitioner earned from his business activity. Concerning the airplane, petitioner had purchased the airplane in 1973 and *429 he contends here, as he had in Page I, that he had contributed it to Chapter 8035. However, when he decided that he wanted to disassociate himself from the Basic Bible Church of America and its promoters, petitioner and his associates established AFC. By some unexplained mechanism, the airplane supposedly turned up in AFC. When confronted with a Minnesota real estate tax assessment approximating $ 13,000 and the potential for a Federal income tax assessment, the airplane was purportedly sold for an amount approximating the real estate taxes to a person who could not fly the airplane. That person, Frayne, is an associate of petitioner who has participated with him in these matters since the initial formation of Chapter 8035. Moreover, the expenses of storage, maintenance, and insurance continued to be paid from the AFC account after the purported sale to Frayne. These factors, coupled with petitioner's other attempts to avoid taxes (local and Federal), support the conclusion that AFC or petitioner did not actually sell the airplane to Frayne and that the true source of the $ 12,200 was not from Frayne or his company. We find petitioner's faithfulness to formality in connection *430 with the purported transfer of the airplane to be entitled to no greater credence than other attempts by petitioner to concoct an appearance of legitimacy to support his attempts to avoid tax. Concerning the $ 10,010 wire transfer, petitioner has offered no evidence other than his own self-serving testimony to support the contention that it was a loan from his mother. It should be noted that petitioner's mother had loaned him $ 6,000 to pay off the contract for deed under which Valley View had been purchased. That loan from petitioner's mother had occurred late in 1983 and was evidenced by a note to petitioner's mother providing for monthly payments with 8-1/2 percent interest. Payments were regularly made on that note to petitioner's mother during 1984 and 1985. Additionally, the loan was secured by antiques that petitioner had purchased. With respect to the alleged $ 10,010 loan, all we have been presented is petitioner's testimony, which in light of this record is not credible. We do not believe that petitioner's mother would have been so cautious and meticulous regarding a $ 6,000 loan in 1983 which was being methodically paid off in 1984 and have at the same time (1984) *431 made a larger $ 10,010 loan with no note, security, interest, or payment schedule. Petitioner also attempted to carry his burden by offering testimony that the unidentified deposits were, to some extent, contributions to AFC from members or other contributors. Currency deposits for 1984 and 1985 totaled about $ 18,000 and $ 27,000, respectively. Respondent points out that the currency deposits were largely made in currency of $ 100 and $ 50 denominations. Petitioner's explanation that these amounts were from contributors or from certain sales of items by other members of AFC, under the circumstances of this case, is not credible. Respondent points out that the July 6, 1984, minutes of the AFC trustees' meeting contains a possible explanation for the currency deposits, as follows: Rev. Page gave a financial report and discussed plans to phase out all bank accounts in order to assure complete financial privacy for the church and to prevent the feds from using financial data found in accounts as a means or basis for illegal and unlawful assessment of church members. It was pointed out that the IRS attempts to assign church funds as income to members and then attempts to assess *432 the members for tax on those assigned income figures. * * *
A review of the pattern of deposits reveals that after the middle part of 1984, the deposit of checks from consulting activity decreased dramatically and virtually ceased after the beginning of 1985. For 1985 the amounts of the overall deposits decreased from about $ 50,000 to about $ 30,000. In all other respects petitioner has not shown that respondent's determination and reconstruction of his income is in error. Accordingly, the deposits to the AFC account, with the exception of the findings of nontaxable sources in this opinion, plus the child support payments, constitute income to petitioner. [4]
*433 C. Do the Facts for the 1984 and 1985 Tax Years Distinguish This Case From Page I?
Petitioner contends that this case is factually distinguishable from Page I for several reasons. Petitioner envisions Page I as involving formation questions; i.e., vow of poverty and contribution of property to a church. Whereas, for the 1984 and 1985 years, petitioner contends that the record reflects that the assets now belong to a religious organization and petitioner is its minister who had no control over the disbursement of funds from the AFC account or the cash fund. [5]
*434 The specific differences, as contended by petitioner, between this case and Page I can be summarized as follows: (1) The checks drawn on the AFC account were countersigned and in most instances by an individual other than petitioner. A review of the checks reveals that Grossinger countersigned substantially all checks during 1984 and 1985 and the other signatures appear to be those of Peterson and Frayne; and (2) the cash fund (two lock boxes) was not under petitioner's direct dominion and control. Apparently, one of the boxes was kept at Valley View and the other was moved to various locations. Although petitioner attempted to show that he had no access to the majority of the cash, it is clear from this record that the cash was used to acquire and provide petitioner's, his family's, and Grossinger's necessities and comforts. There is no evidence in this case, with the exception of limited listings of AFC in directories and politically oriented speeches (sermons) given by petitioner, that any appreciable expenditure, cash or otherwise, was for a charitable purpose. Instead, the vast amount of the expenditures were spent on petitioner, his family, and Grossinger. In substance *435 we find no difference in this respect between the years under consideration and those considered in Page I. The differences cited by petitioner do not mitigate the reality that there was substantial private inurement amply reflected in this case. [6] As noted in Page I, "Even if the benefit inuring to members is small, it would be impermissible under section 170(c)(2)(C). Unitary Mission Church v. Commissioner, 74 T.C. 507, 513 (1980), affd. without published opinion 647 F.2d 163 (2d Cir. 1981)." As pointed out by the Court of Appeals for the Eighth Circuit in affirming Page I: In order for * * * [petitioners] to have been entitled to a tax deduction *436 for the sums they gave to the churches, they would have had to prove that the churches were organized and operated exclusively for religious or charitable purposes and that no part of the sums contributed inured to the benefit of any private shareholder or individual. [Page v. Commissioner, 823 F.2d at 1271.]
D. Amount of Income from Self-Employment
Petitioner agrees that he is subject to self-employment tax for the income specifically identified by respondent in the AFC deposits, but that he is not subject to self-employment tax regarding any amount developed by means of the bank deposits reconstruction or any amount received as a stipend for serving as AFC's minister. In other words, petitioner contends that respondent has not identified the source of the unidentified deposits as being from petitioner's self-employment. Actually, it is petitioner's burden to show that respondent's determination is in error. As discussed earlier in this opinion, petitioner has not carried his burden of showing that respondent's determination is in error. Accordingly, respondent's determination that the unidentified deposits are income from self-employment *437 is also sustained. We note that there is a pattern to the deposits to the AFC account which works against petitioner's position. During the 1984-85 period, the amount of identifiable deposits decreases steadily and stops during 1985. This, coupled with the avowed purpose of petitioner and his associates to secrete their assets from the taxing authorities are additional reasons why it is likely that the unidentified deposits were from petitioner's self-employment activity. Petitioner also argues that the stipend he reported is not subject to self-employment tax. The exemption from section 1401(a) self-employment tax is provided for in section 1402(e). In order to qualify for the exemption under section 1402(e)(1), the individual must be a duly ordained, commissioned, or licensed minister of a church or a member of a religious order and must file a timely application for the exemption together with a statement that he is conscientiously opposed to the receipt of public insurance benefits such as social security. Petitioner is required to receive approval for the exempt status from respondent by filing a Form 4361. The exemption is not granted until the application is approved *438 by respondent. Sec. 1.1402(e)-2A(c), Income Tax Regs. The procedures set forth in the regulations are mandatory and subject to strict compliance. Peverill v. Commissioner, T.C. Memo. 1986-354. Petitioner has shown that he attempted to obtain the exemptions, but there has been no showing that the exemption was granted or that he is entitled to such an exemption. Finally, petitioner has not specifically shown that the reported stipend was earned solely from performing services as a minister. See Templeton v. Commissioner, 719 F.2d 1408, 1411-1412 (7th Cir. 1983), affg. James v. Commissioner, T.C. Memo. 1982-456. Accordingly, no portion of the stipend was shown by petitioner to be exempt from self-employment tax, and respondent's determination is sustained. E. Itemized and Business Related Deductions Claimed by Petitioner
Petitioner, if unsuccessful regarding the bank deposits and the conceded items of income, alternatively argues that he is entitled to various itemized and business deductions. It is noted that petitioner did not claim any itemized or business deductions on his *439 returns for 1984 and 1985, and his alternative position claiming the deductions assumes that the expenses were not those of AFC and/or that AFC's existence is being ignored for purposes of petitioner's tax liability. Respondent, based on the record in this case, makes the following concessions of deductibility: Item
1984 1985 Real estate tax on Valley View
$  9,086.48
--  Interest on tax assessment
1,581.15
--  Interest on loan from petitioner's
mother
114.92
$   260.14
Legal fee paid to Attorney Tigue
--  4,025.00
Total itemized deductions agreed
to by respondent, without
considering zero bracket amount
under sec. 63.
10,782.55
4,285.14
With respect to the $ 1,550.44 special assessment paid in connection with the Valley View property, respondent contends that the amount is not deductible because real property taxes do not include taxes "assessed against local benefits". Sec. 1.164-4(a), Income Tax Regs. Additionally, respondent did not concede as deductible the $ 1,490.56 in penalties paid on the Valley View property because fines and penalties are not provided for under sections 163 or 164 and are generally not deductible under section 162(f). *440 Petitioner does not dispute respondent's analysis concerning which portions of the real estate tax assessment paid during 1984 are deductible. With respect to the interest on the loan due to petitioner's mother, the parties disagree somewhat on the amount, but we find that petitioner has not shown that he is entitled to more than the amounts respondent has conceded for 1984 and 1985. Finally, petitioner argues that he would be entitled to the attorney's fees other than those paid to Attorney Tigue, which respondent conceded. The legal fees reflected as being paid from the AFC account for 1984 and 1985 are as follows: Legal fees
1984
1985
Barry Fisher
$  2,500
--  Joe Mannikko
9,250
$  5,500
Rosenthal & Rondon
--  100
Robert Spector
1,000
7,600
Randall Tigue
--  4,025
Total legal fees
12,750
17,225
Respondent conceded the amount paid to Attorney Tigue and did not concede the amounts paid to other attorneys because petitioner has not shown what portion of their fees, if any, is attributable to the determination, collection, or refund of any tax under section 212(3). Respondent agrees that attorneys Mannikko and Spector did some work on petitioner's *441 tax matters, but that petitioner has not shown the deductible portion. See Zmuda v. Commissioner, 79 T.C. 714, 725 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Our review of the record in this case reveals that a substantial portion of the legal work performed by Attorneys Mannikko and Spector concerned petitioner's tax liability or status, or that of AFC. The essence of most of the legal controversies involved attempts by petitioner to avoid paying tax on his earnings or to avoid paying real estate taxes locally. Although it may be argued that petitioner is not entitled to claim these amounts because they were paid on behalf of AFC, in substance, all of these tax-related matters are petitioner's, and AFC is being used as a means to petitioner's goal of not paying tax. Accordingly, any deductions would be attributable to petitioner, in the same manner as the income was attributable to him. Although the information in the record is not precise, there is sufficient information to reach a conclusion. We find that, in addition to the $ 4,025 conceded by respondent for 1985, petitioner is entitled to deduct attorney's fees *442 of $ 8,200 and $ 10,480 for 1984 and 1985, respectively. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Respondent also conceded that, to the extent that the Court finds that petitioner incurred the particular amounts, petitioner is entitled to deduct $ 722.18 and $ 123.44 as unreimbursed expenses in connection with business activity under section 162. We find that petitioner incurred those amounts and, accordingly, petitioner is entitled to deduct them pursuant to respondent's concession. Petitioner has not shown that he is entitled to any greater amount than the amounts conceded by respondent. In all other respects, petitioner is not entitled to deduct any amounts in excess of the amounts conceded by respondent. The areas of business expenses referred to by petitioner in his testimony and to which respondent does not make any concessions, involve expenses which may have been incurred while traveling away from home. Such expenses are subject to the strict substantiation requirements of section 274(d). The evidence presented by petitioner on these items fall far below the minimum requirements of section 274(d). Smith v. Commissioner, 80 T.C. 1165 (1983); *443 sec. 1.274-5, Income Tax Regs.
F. Additions to Tax
1. Section 6653(a)(1) and (2) -- Respondent determined that petitioner was liable for additions to tax under section 6653(a)(1) and (2). Petitioner bears the burden of proof with respect to such determinations. Rule 142(a); Clayden v. Commissioner, 90 T.C. 656, 677 (1988); Abramo v. Commissioner, 78 T.C. 154, 162-164 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Negligence, within the meaning of section 6653(a), has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In Page I we decided that petitioner was liable for additions to tax for negligence as follows: We have repeatedly sustained the section 6653(a) addition in cases involving the use of a "church" to obtain a deduction for personal and family expenses. Although petitioners have created a more complete or elaborate facade in this instance, we believe that people with petitioner's education and intelligence *444 must have known they could not avoid tax or deduct personal or family expenses in the manner herein accomplished. Davis v. Commissioner, * * * [81 T.C. 806,] 820-821 [(1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985)]. * * * [Page I, T.C. Memo. 1986-275.]
Petitioner argues that he is not subject to the negligence addition for 1984 and 1985 because of his reliance upon two attorneys and petitioner's interpretations of conversations with internal revenue agents. Petitioner, however, did not rely upon attorneys or agents to motivate him to avoid tax by means of his association with a purported religious organization. [7] Instead, it was petitioner's intention to reach those results, and he consulted attorneys to attempt to find ways to attain his goal. Although there were some subtle differences between this case and Page I, we see no difference in the net result of petitioner's actions. Petitioner has not established that in understating the taxes due on his returns he reasonably relied upon competent professional advice. Accordingly, we find petitioner is liable for the *445 additions to tax provided for in section 6653(a)(1) and (2) for the taxable years 1984 and 1985. 2. Section 6654 -- This addition to tax depends upon whether a taxpayer failed to pay or underpaid estimated tax. Petitioner bears the burden of showing that he is not liable for this addition to tax. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioner failed to pay estimated tax. We note, however, that on his returns for 1985 and 1984 he claimed that he had made estimated payments which, based *446 on what he did report, would have resulted in overpayments or refunds. Petitioner does not now argue that estimated payments were made. Petitioner argues that the underpayment is less than $ 500 for each year and, accordingly, that the addition does not apply. Petitioner's argument is dependent upon his being successful concerning the amount of income he should have reported for 1984 and 1985. Because our findings and holding in this case will result in underpayments in excess of the threshold, petitioner has failed to establish that an addition to tax under section 6654 for 1984 and 1985 should not apply. Accordingly, respondent's determination that section 6654 is applicable in both taxable years is sustained. 3. Section 6661 -- Respondent also determined an addition to tax for substantial understatement of tax under section 6661 for both taxable years. Section 6661 provides for a 25-percent addition to tax if there is a substantial understatement of tax. An understatement is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown for the taxable year, or $ 5,000. An "understatement" does not include an amount attributable to "the tax *447 treatment of any item by the taxpayer if there is or was substantial authority for such treatment". Sec. 6661(b)(2)(B)(i). Additionally, an understatement does not include any item for which there was adequate disclosure. Sec. 6661(b)(2)(B)(ii). Petitioner's only argument concerning this addition to tax is that he does not have a substantial understatement because his tax liability should not increase by $ 5,000 in either year. Accordingly, the substantial understatement addition is applicable for the 1984 and 1985 taxable years if the threshold understatement is exceeded with respect to either year. That computation will be made in connection with the Rule 155 computations. 4. Section 6621(c) -- Section 6621(c) provides for interest at 120 percent of underpayment rate then in effect, with respect to the portion of the underpayment attributable to tax-motivated transactions. Section 6621(c)(3)(A)(v) provides that a tax-motivated transaction includes "any sham or fraudulent transaction." Section 6621 has been applied in charitable deduction cases. Snyder v. Commissioner, 86 T.C. 567, 588-589 (1986). It has also been applied to "phony charitable *448 contributions deductions generated by a taxpayer's use of his local ULC church. Mulvaney v. Commissioner, T.C. Memo. 1988-243." Slayback v. Commissioner, T.C. Memo. 1990-200, affd. 957 F.2d 870 (11th Cir. 1992). In this case petitioner attempted to avoid tax liability under attempts to assign income to his "church" and also by means of claiming deductions, when the assignments were questioned. Petitioner's actions in using the church to avoid the payment of tax were tax-motivated, and the additional interest provided under section 6621(c) is applicable for interest on the entire underpayment for both taxable years. G. Section 6673
Section 6673 provides for a penalty if a taxpayer maintains or institutes a proceeding primarily for delay or maintains a frivolous and groundless position. Under section 6673, the Court is given discretion to require a taxpayer to pay a penalty not to exceed $ 25,000. Respondent, without requesting a specific amount, has asked the Court to impose a penalty in this case because it was maintained or instituted for delay or because petitioner's position is *449 frivolous or groundless. In Page I we declined to award damages under section 6673 based upon the record as a whole. In that case, we considered several legal arguments and positions of petitioner. In this case, petitioner has not advanced any additional legal arguments or precedent, but instead contended that his case was factually distinguishable from the prior one. We do not find any meaningful difference between the situation in Page I and this case. We find petitioner's position in the setting of a second trial of the same matters to be frivolous or groundless. [8] The trial, briefing, and rendering of an opinion here were only necessary due to petitioner's insistence and not the need to resolve a meaningful dispute. Accordingly, we find that petitioner is liable for a $ 2,500 penalty under the provisions of section 6673. *450 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Respondent, in an amended answer, conceded that petitioner is not liable for an addition to tax under sec. 6651(a)(1) for the 1984 and 1985 taxable years.↩
2. If sec. 6653(a)(1) is applicable, sec. 6653(a)(2) provides for an additional 50-percent interest on the amount of any underpayment determined to be attributable to negligence in this case.↩
4. Formerly sec. 6621(d)↩.
3. 120 percent of sec. 6601 interest rate on any portion of the deficiency which is a substantial underpayment attributable to a tax-motivated transaction.↩
1. The parties' stipulation of facts is incorporated by this reference.↩
2. The year 1979 was decided in petitioner's favor due to the expiration of the period for assessment prior to respondent's issuance of the notice of deficiency.↩
3. Petitioner contends that his basis in the airplane is $ 9,450 and that he would be entitled to an offset of that amount from any sales proceeds, resulting in a $ 2,750 gain.↩
4. We note that respondent's reconstruction approach is conservative in this case because amounts that were not passed through the AFC account, with the exception of the child support payments, have not been included in the reconstruction to arrive at the unreported amount of petitioner's income for 1984 and 1985. The record reflects that petitioner dealt extensively in cash in order to avoid taxing authorities and avoid detection.↩
5. Petitioner's position has some inherent flaws. Because petitioner claims, with the exceptions of the amounts that respondent has specifically identified, that the unidentified deposits to AFC were contributions by members and because petitioner also argues that he had no more income than the identified items, he finds himself unable to reasonably argue that the unidentified items should be treated as contributions by him if we find, as we did, that the majority of the deposits to the AFC account constituted petitioner's income. In the end result it makes no difference because petitioner has not shown here, as he did not show in Page I, that he is entitled to a charitable deduction for amounts he may have contributed to AFC.↩
6. We do not question here petitioner's exercise of his religious principles or whether AFC could be classified as a organization within the meaning of sec. 501(c)(3). Instead, the question addressed concerns sec. 170 and whether any of the income earned by petitioner can be reduced by his alleged contributions.↩
7. Petitioner's right to exercise his religion is not in question. Additionally, because of our finding of substantial private inurement, it is not necessary to decide whether AFC was a "church". Our opinion and resulting decision involve whether petitioner successfully diverted his earnings to another entity and whether he has shown that he is entitled to deductions for contributions and other alleged expenditures, under the appropriate sections of the Internal Revenue Code.↩
8. We note that the Court of Appeals for the Eighth Circuit also rejected petitioner's legal grounds in affirming Page I. Additionally, the Circuit Court found petitioner's appeal to be frivolous and imposed a sanction directing double costs and $ 5,000 attorney's fees (damages). Page v. Commissioner, 823 F.2d at 1263, 1273 (8th Cir. 1987), affg. T.C. Memo. 1986-275↩.