T.C. Memo. 1996-87


UNITED STATES TAX COURT


BILL MCDONALD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RICHARD D. MAYNARD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 13218-93, 13220-93.  Filed February 28, 1996.


<u>Roderick L.  MacKenzie</u>, for petitioners.

<u>Kathryn K. Vetter</u> and <u>Daniel J.  Parent</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in 1989 income tax, and penalties as follows:

| Petitioner | Deficiency | Fraud Penalty Sec. 6663 |
|---|---|---|
| McDonald | $53,041 | $39,781 |
| Maynard | 71,380 | 53,535 |

After considering the parties' concessions and stipulations to be bound by the outcome of other cases, the issues remaining for our consideration are: (1) Whether petitioners' partnership's 1989 income was understated; (2) whether petitioners correctly reported their distributive shares of partnership income; (3) whether either petitioner failed to report income with respect to various items respondent determined to be includable in his income; (4) whether either petitioner is liable for additional self-employment tax; and (5) whether either petitioner is liable for the fraud penalty under section 6663.[1]

## FINDINGS OF FACT[2]

Petitioners Bill McDonald (McDonald) and Richard D. Maynard (Maynard) resided in California at the times each of their petitions was filed in these cases. McDonald and Maynard each filed his 1989 income tax return reflecting that his filing status was "single". Although McDonald and Maynard were each married as of the close of 1989, they, along with their respective spouses, filed for and received annulments of their marriages during 1994. The question of whether McDonald and Maynard were married or single for Federal income tax purposes, considering the annulments of their respective marriages, was decided by this Court in McDonald v. Commissioner, T.C. Memo.

---

[1] Section references are to the Internal Revenue Code in effect for the year under consideration. Rule references are to this Court's Rules of Practice and Procedure.

[2] The parties' stipulation of facts and exhibits are incorporated by this reference.

1994-607, and <u>Shackelford v. Commissioner</u>, T.C. Memo. 1995-484, respectively.[3]  Respondent and petitioners agreed to be bound by the outcome of the above-referenced opinions.  The above-referenced opinions hold that the taxpayers were married for Federal income tax purposes, although they had subsequently obtained annulments of their marriages under the laws of the State of California.  Accordingly, petitioners' filing status should have been "married filing separately" for purposes of their 1989 tax year.

Petitioners, at all pertinent times, were certified public accountants, with more than 60 years of experience between them, practicing together in an accounting partnership known as Maynard & McDonald (M&M).  There was no written partnership agreement through the 1989 tax year.  McDonald is also an attorney licensed to practice in the State of Oklahoma.  M&M is a cash basis partnership that petitioners formed in 1976 and operated during the 1989 taxable year in Sacramento, California.  M&M's principal activities are tax return preparation, assistance to clients in tax-related matters, providing accounting services, and representing clients before various administrative levels of the Internal Revenue Service.  In addition, McDonald also filed clients' petitions with this Court.  McDonald was familiar with

---

[3] Petitioners were either the parties in the underlying cases or referenced in several recent opinions issued by this Court.  See <u>Bill McDonald, et al. v. Commissioner</u>, T.C. Memo. 1994-607; <u>Denver W.  McDonald v. Commissioner</u>, T.C. Memo. 1995-359; <u>Betty J. Shackelford v. Commissioner</u>, T.C. Memo. 1995-484; and <u>Mary C. McDonald v. Commissioner</u>, T.C. Memo. 1995-503.

the requirement that tax return preparers are to keep copies of prepared returns or a list of clients. Petitioners' accounting practice specialized in the field of taxation.

M&M's 1989 U.S. Partnership Return of Income (Form 1065), which McDonald prepared, reflected gross receipts of $24,590 and a single deduction of $24,590 attributable to "Guaranteed payments to partners". Other than on the Schedules K-1, no other information was reflected on the partnership return (i.e., the balance sheet was left blank, and the Schedule M for reconciliation of partners' capital was marked "NA"). The Schedules K-1 revealed that Maynard and McDonald were 50-50 partners, but that McDonald was allocated $3,457 of the guaranteed payments to partners, and the remaining $21,133 was allocated to Maynard. McDonald's $3,457 share of M&M's 1989 income was based on Maynard's estimate. Petitioners did not maintain records of the number of hours worked or number of returns prepared by each partner.

M&M's returns for the fiscal year ended September 30, 1987, the period October 1 through December 31, 1987, and the 1988 calendar year each reflect that petitioners shared profits and losses in a 50-50 ratio. These three returns reflect income and guaranteed payments to petitioners, as follows:

| Taxable Period | Income | McDonald | Maynard |
|---|---|---|---|
| FYE 9/30/87 | $5,520 | $3,670 | $1,850 |
| 10/01 to 12/31/87 | 750 | 500 | 250 |
| Calendar 1988 | 24,469 | 3,711 | 20,758 |

Accordingly, for two of the reporting periods, McDonald received about two-thirds and Maynard about one-third of M&M's income. In the third reporting period, Maynard received about 85 percent and McDonald about 15 percent.

Respondent's agents analyzed the ratio of hours spent during 1989 by Maynard and McDonald in preparing returns of M&M's clients and found it to be about 60 percent for Maynard and 40 percent for McDonald. Respondent, in the notices of deficiency, determined $214,393 of 1989 partnership income and attributed $79,661 to McDonald and $134,732 to Maynard.

M&M did not have any employees, and petitioners were solely responsible for maintaining M&M's books and records. Petitioners' billing approach was to send a bill for services to clients and retain a copy for M&M's records. When they received payment of a particular bill, M&M's retained copy of the bill was discarded. Petitioners' billing approach made it virtually impossible to verify whether M&M's income was accurately reflected on its books and Federal partnership tax return and on petitioners' Schedules K-1.

M&M's rate schedule, as of January 1, 1989, was $130 per hour for tax consulting or compliance work and a $275 minimum rate for individual tax return preparation. Petitioners would charge for giving advice, including advice given during telephone calls, with a one-tenth-hour minimum charge. The printed rate schedule contained the notation that, where advice resulted in substantial savings or was out of the ordinary, the billing might

reflect petitioners' experience and expertise, rather than the posted rates.  Occasionally, petitioners sent no bill because they decided to provide gratuitous services.  Actual charges to M&M clients reflect that some clients were billed at a rate in excess of and some less than M&M's minimum rate.

During respondent's examination of their 1989 tax years, petitioners did not provide books, records, copies of M&M's bills to clients, or any other information from which petitioners' clientele could be identified or respondent could verify petitioners' income for 1989.  Respondent's computers reflect that M&M was shown as the preparer on more than 300 Federal tax returns for the 1989 processing year.  In addition, McDonald filed 13 clients' petitions with this Court during 1989.

Petitioners sought the protection of the Bankruptcy Code, McDonald in December 1980 and Maynard in April 1981.  To avoid the possibility of attachment of their accounts receivable, petitioners formed a California corporation, Gold Country Financial, Inc. (Gold), to conduct a tax accounting business concurrently with and at the same location as M&M.  Gold also provided petitioners with a means to obtain credit after their bankruptcies because they were employees of Gold.  Moreover, Gold's sole shareholder was shown as Terry Feil, a friend of Maynard's.

Corporate Federal income tax returns were filed for Gold's fiscal years ended July 31, 1989 and 1990.  Gold's income and expenses were reported on the accrual method of tax accounting.

Petitioners maintained the books and records of Gold.  M&M did not claim expenses, and any expenses concerning petitioners' tax accounting businesses were paid and/or deducted by Gold.  Gold had no employees other than petitioners.

Similar to M&M, petitioners maintained no cash receipts journal, accounts receivable list, or client list for Gold.  Also paralleling the practices at M&M, copies of client billing invoices were discarded after payment was received from the clients.  Petitioners, however, maintained cash disbursements records for Gold during 1989.

Petitioners maintained a bank account in Gold's name at the Merchants National Bank (Merchants Bank), and some, but not all, of the receipts from clients were deposited into that account.  Petitioners' method of determining Gold's annual income for tax purposes began by totaling the Merchants Bank deposits and reducing the total by reimbursements for health insurance.  The difference was then adjusted by picking up net increases or decreases in accounts receivable to convert to the accrual method.  Finally, the accrual method amount was reduced by expenses that petitioners had billed to and collected from clients.

For the 1989 and 1990 fiscal years, Gold's income was computed and reported by petitioners as follows:

| Item | 1989 | 1990 |
|------|------|------|
| Deposits to bank | $68,975.82 | $70,669.74 |
| Less: | | |
| Auto expenses | 10,710.25 | - |
| Insurance reimbursed | 2,591.84 | 5,211.40 |
| Accounts payable | 13,338.00 | - |
| Dues/publications | 49.50 | - |
| Outside services | 505.83 | - |
| Refunds | 175.00 | - |
| Accounts receivable | (825.00) | 15,469.78 |
| Total | 26,545.42 | 20,681.18 |
| Income per petitioners | [1]42,430.40 | 49,988.56 |

[1] The parties stipulated that the amount of income computed by petitioners for the 1989 fiscal year was $42,430.10, whereas the supporting amounts stipulated by the parties results in income of $42,430.40.

Petitioners also maintained a bank account for Gold at the Bank of Lodi. The existence of Gold's Bank of Lodi account was not brought to the attention of respondent's agent by petitioners. Respondent's agent discovered the Bank of Lodi account from a review of canceled checks obtained from third-party sources (Gold's clients). Petitioners deposited some clients' payments for services by both M&M and Gold in the Bank of Lodi account for the fiscal years 1987, 1988, 1989, and 1990. Petitioners did not report the Bank of Lodi deposits in Gold's income. For 1989, checks were written on the Bank of Lodi account to Maynard and McDonald in the total amounts of $20,421 and $6,024, respectively. Neither Maynard nor McDonald reported funds for 1989 from Gold's account with the Bank of Lodi.

Respondent determined that Gold's income for the 1989 fiscal year was understated by $63,581 and that $29,292 of deductions were not allowable. Gold's petition to this Court was dismissed

due to lack of capacity after the State of California had suspended its charter.

Respondent's agent, Arthur Pease (Pease), examined M&M's partnership returns for the taxable year ended September 30, 1987, and the calendar years 1987, 1988, and 1989. Petitioners did not provide the identification of their clients, and Pease was forced to reconstruct client information by using Internal Revenue Service computer data (return preparer information) and by canvassing third parties (petitioners' clients and banks). Pease obtained copies of clients' returns prepared by petitioners that reflected the fee for tax preparation. Pease also received a rate sheet for M&M from one of petitioners' clients. In addition, Pease received numerous letters that contained information about the fees charged for return preparation. Pease also engaged in numerous telephone conversations with petitioners' clients concerning the fees that petitioners charged them.

Based on his research, Pease prepared a schedule of clients, referencing the accumulated information along with references to sources for respondent's reconstruction of petitioners' income for the 1989 taxable year. Where Pease determined that an individual return had been prepared and that no invoice, deposit information, canceled check, or client information was available to reflect the fee charged, he used a $275 preparation fee, the minimum charge for an individual return reflected on M&M's rate schedule. Based on the information available to him, Pease

determined that the average 1989 return preparation fee was $482 for an individual return, $1,400 for a corporate return, and $1,250 for a partnership return. In his reconstruction, Pease also accounted for the fact that some returns were prepared gratuitously. Pease determined total 1989 fees of $192,201. Based on information provided by petitioners during trial preparation, respondent conceded on brief that total combined reconstructed 1989 fees were $185,128.

To determine M&M's income for 1989, deposits into Gold's Merchants Bank account for the first 7 months were eliminated in the total amount of $33,388 because Gold had reported that amount for its taxable year ended July 31, 1989. No adjustment for Merchants Bank deposits was made for the last 5 months of 1989 because petitioners did not provide income and accounts receivable records for that period. There was no consistency about which entity prepared a particular client's return (it would indiscriminately vary between M&M and Gold from year to year).

Petitioners, in their respective 1989 income tax returns, did not report the $250 monthly payments for automobile expenses received from Gold during 1989. Petitioners reduced the amount of the Merchants Bank deposits reported in Gold's income by the amount petitioners paid for automobile expenses. Petitioners did not submit any documentation to Gold in support of their automobile mileage or expenses for 1989. Maynard conceded that the 1989 automobile reimbursement received from Gold was income

to him for 1989. Maynard testified that all payments to petitioners for 1989 from the Bank of Lodi were his income or expense reimbursement.

Gold, during 1989, paid the California Society of Certified Public Accountants $16,325.36 for health insurance for several individuals, including petitioners. One of those individuals was McDonald's former accounting partner, who reimbursed Gold $2,765.44 for his portion of the insurance. The remaining insured individuals were petitioners and members of their families. Although petitioners prepared returns on behalf of Gold, they claim to have not received any compensation other than the monthly automobile reimbursement and insurance coverage.

Maynard did not have a personal bank account, and he paid bills with cash or checks from the checking account of another individual. McDonald and Maynard, during 1989, made cash purchases of numerous cashier's checks in amounts of $10,000 or less for various purposes. Maynard purchased two $7,500 cashier's checks on June 8, 1989, from two separate banks. On that same date, McDonald purchased a $9,000 and a $10,000 cashier's check from separate banks. A series of cashier's checks, including the ones purchased on June 8, 1989, was used as part of the purchase price of a residence which was placed in the name of McDonald's wife. McDonald purchased numerous cashier's checks, mostly with cash, during 1989. The dates, amounts, and bank locations were as follows:

| 1989 Date | Amount | Location Purchased |
|-----------|--------|--------------------|
| Apr. 20 | $3,000 | Commerce Savings |
| June 8 | 9,000 | Commerce Savings |
| June 8 | 10,000 | Bank of Alex Brown |
| June 12 | 9,000 | Wells Fargo |
| June 14 | 1,432 | Wells Fargo |
| June 14 | 2,594 | Wells Fargo |

Respondent concedes that the source of the $10,000 cashier's check would not result in income to McDonald.

McDonald's wife remitted three checks to Maynard during 1989 in the following amounts:  $995.90, $550, and $699.50. McDonald's daughter also remitted a $2,500 check to Maynard during 1989.

## OPINION

Procedural Question--Initially, we consider petitioners' procedural argument that the notices of deficiency are "arbitrary and capricious".  Petitioners argue that respondent should have the burden of going forward with the evidence because respondent's determination is arbitrary and capricious and that respondent's determination should not enjoy a presumption of correctness.  See Jackson v. Commissioner, 73 T.C. 394, 403 (1979); Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979), revg. 67 T.C. 672 (1977).  By contending that the notices are arbitrary, petitioners are essentially asking us to look behind the notices of deficiency to examine the evidence used by respondent in making her determinations.  Riland v. Commissioner, 79 T.C. 185, 201 (1982); Jackson v. Commissioner, supra at 400; Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327

(1974); <u>Weimerskirch v. Commissioner</u>, <u>supra</u>. We have looked behind the notice in those rare instances where respondent relied upon a "'naked' assessment without <u>any</u> foundation whatsoever". <u>United States v. Janis</u>, 428 U.S. 433, 441 (1976); <u>Jackson v. Commissioner</u>, <u>supra</u> at 401.

In <u>Weimerskirch v. Commissioner</u>, <u>supra</u>, and <u>Dellacroce v. Commissioner</u>, 83 T.C. 269 (1984), the Government possessed no evidence linking the taxpayers to illegal income. In <u>Dellacroce</u>, we held the notice of deficiency to be arbitrary because the reconstruction of income did not link the taxpayer to the income-generating activity.

In this case, by contrast, there is ample evidence, including numerous concessions by petitioners, reflecting that petitioners' income was not fully reported. Respondent has shown a clear and direct linkage to sources of unreported income in this case. See <u>Adamson v. Commissioner</u>, 745 F.2d 541 (9th Cir. 1984), affg. T.C. Memo. 1982-371. Accordingly, we find that respondent's determination is not arbitrary.

<u>Income Reconstruction</u>--Where, as here, taxpayers have failed to provide adequate records substantiating their income, an indirect method may be used to reconstruct their income. <u>Holland v. United States</u>, 348 U.S. 121 (1954). Petitioners bear the burden of proving that the determinations made by respondent in the notices of deficiency are erroneous. Rule 142(a); <u>Cracchiola v. Commissioner</u>, 643 F.2d 1383 (9th Cir. 1981) (citing <u>Welch v. Helvering</u>, 290 U.S. 111 (1933)), affg. per curiam T.C. Memo.

1979-3; Webb v. Commissioner, 394 F.2d 366, 372 (5th Cir. 1968), affg. T.C. Memo. 1966-81.  Taxpayers are required to maintain records--transactions should be documented, contracts provided, and expenses substantiated.  Sec. 6001; Norgaard v. Commissioner, 939 F.2d 874, 878 (9th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-390.

The Commissioner is entitled to use a reconstruction method where a taxpayer's books and records are either inadequate or nonexistent.  Holland v. United States, supra; United States v. Johnson, 319 U.S. 503 (1943); Campbell v. Guetersloh, 287 F.2d 878, 880 (5th Cir. 1961); Adamson v. Commissioner, supra; Keogh v. Commissioner, 713 F.2d 496 (9th Cir. 1983), affg. Davies v. Commissioner, T.C. Memo. 1981-438; United States v. Stonehill, 702 F.2d 1288 (9th Cir. 1983).  Petitioners do not dispute that respondent is entitled to use a reconstruction method. Petitioners argue that the method of reconstruction used by respondent was flawed and/or arbitrary.[4]

Petitioners, who are tax professionals, failed to keep any record of cash receipts, although they did maintain records of their cash expenditures.  Petitioners intentionally discarded the only records from which their income could have been verified. Although petitioners' tax accounting business activity has been

---

[4] Respondent's reconstruction of petitioners' income included any income earned through the M&M partnership.  The corporate income of Gold was the subject of another case.  That case was dismissed due to Gold's loss of its corporate status and, hence, capacity to file a petition in this Court for relief.

continuous from 1976 through 1989, the year at issue, it was operated through several entities. Until both petitioners had financial difficulties and went through bankruptcy, they had operated their business as a partnership. After the financial difficulties, petitioners interposed a corporate entity partly to deceive creditors and others. The corporate entity allegedly paid all expenses of petitioners' tax accounting business, and only a part of the income from such activity was reported by the corporate entity. Allegedly, the corporate entity did not pay petitioners' salary for their return preparation activity. Instead, petitioners allegedly received benefits such as insurance and automobile allowances, and their business overhead was borne by the corporation.

After the corporate formation, the partnership entity continued to operate and report some of the business income, but none of the expenses. The income reported on the partnership return was distributed as guaranteed payments to partners in unequal amounts, even though petitioners were shown in the Schedules K-1 as 50-50 partners and no partnership agreement was in existence. Petitioners, by commingling these entities and their business activities, created a murky environment in which it is difficult to discern the sources of income or the entity by which an expense had been incurred. Petitioners' discarding records of income made this situation even more difficult to unravel. Finally, petitioners did not cooperate in the examination process, forcing respondent's agent to seek third-

party records from banks and clients in order to reconstruct income.

Under these circumstances, Pease was able to specifically determine the identity of some clients and a range of the fees charged. Where the amount of a client's fee was not available, Pease used the minimum fee. In instances where it was possible to discern that specific income had been reported on Gold's return (the corporate return), Pease eliminated that amount from his reconstruction of the partnership return. Where the corporate income, if any, could not be discerned or verified, Pease, in order to protect the Government's interest, attributed the income to the M&M partnership. In those instances, there may have been duplication between the income reported for Gold and the income determined for petitioners through M&M. With respect to one of those instances, respondent conceded on brief that the amount of partnership income determined for 1989 should be reduced by $4,938 for the deposits in Gold's Merchants Bank account during the last 5 months of 1989.

Courts have approved methods of reconstruction which project or extrapolate from a limited amount of information. See, e.g., Gerardo v. Commissioner, 552 F.2d 549 (3d Cir. 1977), affg. in part and revg. in part T.C. Memo. 1975-341; Adamson v. Commissioner, supra. In Adamson v. Commissioner, supra at 548, the court stated as follows:

> Where the government has introduced evidence
> linking the taxpayer to the illegal activity, the
> taxpayer should not be allowed to avoid paying taxes

simply because he keeps incomplete records. The absence of tax records cannot automatically deprive the Commissioner of a rational foundation for the income determination. As the Fifth Circuit recognized in Webb v. C.I.R., 394 F.2d 366, 373 (5th Cir. 1968):

> [T]he absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes .... [However,] such absence does weaken any critique of the Commissioner's methodology.
>
> Arithmetic precision was originally and exclusively in [the taxpayer's] hands, and he had a statutory duty to provide it .... [H]aving defaulted in his duty, he cannot frustrate the Commissioner's reasonable attempts by compelling investigation and recomputation under every means of income determination. Nor should he be overly chagrined at the Tax Court's reluctance to credit every word of his negative wails.

See also Figueiredo v. Commissioner, 54 T.C. 1508 (1970), affd. per order (9th Cir., Mar. 14, 1973); Estate of Mason v. Commissioner, 64 T.C. 651 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Petitioners in this case have not provided records or a more reasonable or accurate method of reconstructing their income.

Petitioners attacked respondent's reconstruction method by arguing that duplication occurred and by testifying that the reconstruction was in error based on petitioners' recollections that certain clients were charged lesser fees or no fees. Petitioners, though they are tax professionals, failed to keep adequate records and thus created this situation in which respondent is unable to specifically verify or reconstruct the fees charged to certain clients or to determine whether, in some

instances, the corporation or partnership had earned or received fees. As a result of the failure to maintain adequate records, petitioners' testimony is uncorroborated and rendered less credible. Although petitioners pointed out situations where they contended that no fee or a lesser fee was charged, when asked whether Pease understated any fees, petitioners' recollection failed them.

Moreover, Pease was not able to secure the names of all of petitioners' clients. Petitioners were either unable or unwilling to disclose the identity of clients missed or not located by Pease. Finally, petitioners were evasive and vague when confronted by the Court with inconsistencies in their testimony or evidence. Considering all these circumstances, we find petitioners' testimony to be uncorroborated and without credibility.

Petitioners also argue that some of their clients may have failed to pay for services performed. In those instances, petitioners argue that M&M, which is on the cash method of accounting, should not include those amounts for the 1989 year. Petitioners' argument has several fatal weaknesses. Initially, petitioners have no proof (because they discarded the billing and receivable records) of who actually paid and who did not. It was the absence of those records that forced respondent to reconstruct petitioners' income for 1989. A reconstruction method is not a direct method of accounting, but an indirect method which can, to some extent, be based on judgment. Again,

petitioners' attack on the judgmental aspects of respondent's reconstruction are dependent on information that petitioners knowingly and intentionally discarded.[5]

We must emphasize that petitioners have not performed a reconstruction of their corporate, partnership, or individual income by which we could test the accuracy of respondent's method.  Petitioners have provided only their self-serving testimony, which is both uncorroborated and contradictory to the record in this case.  Accordingly, we hold that the reconstruction is appropriate, as modified through the concessions made by respondent.

Division of Partnership Income--Respondent contends that the reconstructed partnership income should be split equally by Maynard and McDonald.  Petitioners have, by designation as "guaranteed payments", divided M&M's $24,590 of reported income $3,457 to McDonald and $21,133 to Maynard.  That division equals approximately 14 percent for McDonald and 86 percent for Maynard. Through 1989, petitioners did not have a written partnership

---

[5] Petitioners also argued that the doctrine of judicial estoppel should be applied in this case to preclude respondent from making the alternative determination that income from the tax accounting practice could, in some instances, be attributed to Gold and M&M.  That doctrine is inappropriate in this setting. Because of petitioners' lack of adequate records, respondent has taken alternative positions with respect to income that petitioners could not verify or show belonged to either the corporation or the partnership.  Respondent is permitted to take such positions, and it is petitioners' obligation to show which of the entities, if any, is obligated to report the income.  The mere reporting of the income on the corporate return does not enable petitioners to meet their burden.

agreement, and all of their Schedules K-1 reflect that their partnership interests were 50 percent each. Three other M&M returns reflect conflicting and varying divisions of profits by Maynard and McDonald. Two of them divide M&M's profit about two-thirds for McDonald and one-third for Maynard. The third return reflects a division of profit of about 85 percent for Maynard and 15 percent for McDonald. This erratic pattern does not lend much support for petitioners' argument. Respondent contends that petitioners manipulated their income between them depending on the circumstances. For example, respondent contends that a large portion of the income for 1988 and 1989 was shifted to Maynard because he had claimed large carryover losses from prior years.

Section 702(a) requires that a partner account for her distributive share of partnership income. In the absence of a partnership agreement, a partner's distributive share is to be determined in accord with the partner's interest in the partnership. Sec. 704(b). Petitioners argued that their oral partnership agreement was that McDonald's income was not to exceed $6,000. In their testimony, however, petitioners admitted that no record of work completed or other measure of their efforts was maintained. Further, petitioners testified that Maynard would estimate an amount for McDonald at the end of each year.

Respondent, in the notices of deficiency, determined $214,393 of partnership income, attributing $79,661 to McDonald and $134,732 to Maynard. That determination hypothesizes that

McDonald and Maynard split partnership profits by a ratio of approximately 37 to 63 percent.

More in line with the statutory notices, Agent Pease's analysis reflected that the 1989 return preparation ratio between Maynard and McDonald was about 60 percent to 40 percent, respectively. McDonald, however was responsible for the administrative duties, including billing, banking, record keeping, etc. Other than their self-serving testimony, petitioners have not produced any evidence of a partnership agreement. In addition, petitioners' financial transactions, which included shifting relatively large amounts of cash between petitioners and their families, combined with petitioners' indiscriminate use of reported and unreported bank deposits for personal purposes, and their failure to distinguish between interests in the partnership and corporate entities, severely weaken petitioners' credibility regarding their alleged partnership arrangements.

Petitioners' position that Maynard was entitled to the partnership profits in excess of $6,000 defies belief and is wholly unsupported by the evidence in the record. On the other hand, respondent, although determining in the notices of deficiency a ratio of about 37 percent to 63 percent for McDonald and Maynard, respectively, argues on brief that the partnership income should be split 50 percent-50 percent, as reflected on the Schedules K-1. We do not find the 50 percent-50 percent reported position of petitioners to be any more persuasive or less self-

serving than their testimony that McDonald was to receive no more than $6,000. Based on the evidence, including the flow of funds between petitioners and petitioners' family members, we hold that the 37 percent to 63 percent ratio determined in the statutory notices is the best approximation of petitioners' partnership arrangement to share profits and losses.

Payments From Gold to Petitioners--Respondent determined that the 1989 payments by check, totaling $8,774 for McDonald and $23,671 for Maynard, from Gold were income to petitioners and should have been reported. Gold also paid for insurance for petitioners and some of their family members, for which respondent did not make a determination or adjustment to petitioners' 1989 income.

Petitioners contend that a part of the amounts paid by Gold represented a $250 monthly automobile allowance and that the remainder, whether received and cashed by McDonald or Maynard, was Maynard's funds. In that regard, Maynard testified that all of these check payments from Gold, both for automobile and otherwise, are either income or expense reimbursement to him, with the exception of the $250 per month automobile allowance from Gold to McDonald.

With respect to McDonald's automobile expenses, McDonald did not submit any records or documentation to Gold contemporaneously with the monthly payments during 1989. For purposes of trial, McDonald submitted documentation reflecting over $3,000 for automobile expenses, including gasoline charge receipts, repair

and maintenance bills, and a letter from his automobile insurance provider noting the annual premium. McDonald testified that, during 1989, he drove his automobile 8,000 miles, 90 percent of which represented business miles.

Under section 274(d), taxpayers are required to meet certain substantiation requirements in order to be entitled to a deduction for certain business expenses. Section 274(d)(4) (which is effective for taxable years beginning on or after January 1, 1986) requires substantiation for a taxpayer to be entitled to deduct travel expenses. McDonald's substantiated expenditures connected with his automobile for the 1989 year exceed the total of the $250 monthly payments received from Gold. McDonald offered no records or other evidence, however, of the business use of his automobile other than his testimony, which was expressed in terms of a rough estimate without any meaningful detail or contemporaneous support. McDonald has not met the section 274(d) requirements necessary to show entitlement to transportation deductions, and, accordingly, respondent's income determination regarding the monthly payments from Gold is sustained. Rule 142(a).

Maynard and McDonald both contend that the remainder of payments from Gold to petitioners is attributable to Maynard, even though $6,024 of the checks was written to McDonald from Gold's Bank of Lodi account. Petitioners, here again, bear the burden of showing error regarding respondent's determination that $6,024 is income to McDonald and $20,421 is income to Maynard.

Rule 142(a). Petitioners have failed to carry their burden. We find petitioners' explanation that the $6,024 in Gold checks was written to McDonald and cashed by him for Maynard to be incredible. The credibility of petitioners' position is further strained by the grossly disproportionate division of M&M's income to them. Accordingly, respondent's determination is sustained.

Miscellaneous Controverted Items Determined by Respondent To Be Income--McDonald's wife remitted three checks to Maynard during 1989 in the following amounts: $995.90, $550, and $699.50. McDonald's daughter also remitted a $2,500 check to Maynard during 1989. Respondent determined that these payments constitute income to Maynard. In addition, Maynard purchased, with cash, two $7,500 cashier's checks from different banks during 1989, and respondent determined that the source of the cash was untaxed income from clients that had not been deposited into the bank or otherwise reported as income for financial or tax purposes.

McDonald purchased numerous cashier's checks, mostly with cash, during 1989. The dates, amounts, and bank locations were as follows:

| 1989 Date | Amount | Location Purchased |
|-----------|--------|--------------------|
| Apr. 20 | $3,000 | Commerce Savings |
| June 8 | 9,000 | Commerce Savings |
| June 8 | 10,000 | Bank of Alex Brown[1] |
| June 12 | 9,000 | Wells Fargo |
| June 14 | 1,432 | Wells Fargo |
| June 14 | 2,594 | Wells Fargo |

[1] Respondent conceded that the $10,000 cashier's check was from a source that was not taxable to McDonald.

Respondent determined that these amounts, along with $1,000 cash deposited by McDonald in the M&M trust account, constitute income to McDonald because the source of the cash was untaxed income from clients that had not been deposited into the bank or otherwise reported as income for financial or tax purposes.

With respect to the $2,500 item from McDonald's daughter to Maynard, petitioners argue that Maynard first gave the $2,500 to McDonald's daughter, who, in turn, gave it to McDonald to purchase the $2,594 cashier's check that went to purchase the home placed in McDonald's wife's name. Ultimately, petitioners would have us believe that this circuitous route for the $2,500 was concluded when McDonald's daughter repaid Maynard. Other than the $2,500 item, petitioners make no particular argument with respect to the cash items that respondent determined were income to Maynard. With respect to McDonald, it is contended that he had available to him from both taxable and nontaxable sources almost $21,000 with which to purchase the cashier's checks remaining in controversy. Ostensibly, the $21,000 represents all of McDonald's sources from which he was able to make applications, which would include, in addition to purchasing

cashier's checks for the purchase of a home placed in his wife's name, living and other personal expenditures.

The controverted cashier's checks total $25,000, which, initially, would indicate a shortfall of about $4,000 between McDonald's sources and applications. Further, McDonald's analysis does not account for living expenses. Finally, McDonald's analysis of the possible sources is offered in a vacuum and does not account for undeposited receipts from clients. Again, petitioners' intentional discarding of the accounts receivable information and the concealment of the identity of their clients is the reason the source analysis is not complete or reliable.

Under these circumstances, we find that petitioners have not carried their burden. Hence, respondent's determination that the various checks and cash items are income to petitioners is sustained.

Self Employment Tax--To the extent that additional income is determined in these cases, petitioners agreed on brief that any increase in self-employment tax is merely computational. Respondent determined that additional income was derived from petitioners' practice of tax accounting. Such income of petitioners is subject to self-employment tax.

Taxability of McDonald's Social Security Benefits--This appears to be a computational item that is dependent on the parties' agreement to be bound by the final outcome of an earlier case regarding whether McDonald was married for tax purposes

during the period in question.  The outcome of that case, along with the holdings herein regarding the amount of unreported income, will dictate the amount of McDonald's taxable Social Security benefits.

Fraud Penalty--Respondent determined, pursuant to section 6663, that each petitioner is liable for a fraud penalty with respect to the entire income tax deficiency determined for their respective 1989 tax years.  Section 6663(a) imposes a 75-percent addition to tax on any portion of an underpayment attributable to fraud.  Under section 6663(b), if the Commissioner establishes that any portion of an underpayment is attributable to fraud, then the entire underpayment is treated as attributable to fraud, except to the extent that a taxpayer can establish by a preponderance of the evidence that any portion of the underpayment is not due to fraud.

Respondent has the burden of proving, by clear and convincing evidence, that each petitioner fraudulently intended to evade his tax.  Sec. 7454(a); Rule 142(b).  To meet this burden, respondent must show that there was intent to evade taxes known to be owing by conduct intended to mislead, conceal, or prevent tax collection.  Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  Respondent must also show (1) that there is an underpayment of tax, and (2) that part of such underpayment is due to fraud.  Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

Based on our holdings regarding respondent's reconstruction of partnership income, miscellaneous items of income, and several

concessions by petitioners, there can be no doubt that there was an underpayment of tax in each petitioner's 1989 tax year.  Thus, we must decide for each petitioner whether any portion of such underpayment was due to fraud.  Id.

Fraudulent intent is seldom proven by direct evidence; hence, the courts have relied on certain indirect evidence in determining whether or not fraudulent intent existed.  These "badges of fraud" include:  (1) Understating income; (2) keeping inadequate records; (3) failing to file tax returns; (4) providing implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failing to cooperate with tax authorities.  Bradford v. Commissioner, 796 F.2d at 307.

Respondent contends that in these consolidated cases all of the above-referenced badges of fraud exist, except that petitioners did not fail to file returns.  Petitioners contend that respondent has not shown fraud by clear and convincing evidence and that Maynard "believed that he was entitled to a large net operating loss carryforward which would alleviate any income tax liability and that he would not be able to utilize the balance of the loss carryforward within the statutory time."  We find petitioners' explanation to be disingenuous considering that they are tax professionals.  We find that respondent has shown that each petitioner's underpayment of tax for 1989 was due to fraud within the meaning of section 6663.  We also find that petitioners have not shown that any part of the underpayments was not due to fraud.

The record here is replete with evidence of petitioners' fraudulent intent. Petitioners, tax professionals who prepare tax returns for a living and represent clients before the Internal Revenue Service, were aware of the need for documentation and records to support the items reported on tax returns. In light of their having that knowledge, coupled with other evidence, we find that their discarding of their supporting income and client documentation was an intentional act designed to conceal and evade the reporting and payment of Federal income tax. Other factors that support a finding of fraud include the relatively large underpayments, use of the corporate entity to conceal information from creditors (including respondent), manipulation of deductions and income between the corporate and partnership entities, dealing in cash (including the purchase of multiple cashier's checks on the same date in amounts less than $10,000[6]), failure to deposit and account for payments for services from clients, use of multiple bank accounts and failure to disclose their existence to respondent's agent, failure to cooperate with respondent's agent (including refusal to divulge the names of clients), attempts to obtain corporate deductions by making monthly payments as travel reimbursement when such travel was both undocumented and not for business purposes, and manipulation of income between petitioners and their family members.

---

[6] Financial institutions are required to report to the Federal Government cash transactions in excess of $10,000. See 31 U.S.C. sec. 5313(a) (1994); 31 C.F.R. sec. 103.22 (1995).

In addition to the items specifically proven by respondent, petitioners conceded numerous adjustments determined by respondent to be unreported income or deductions to which petitioners were not entitled.

To the extent no settlement or concession was made regarding any other item determined by respondent, petitioners have not come forward with arguments or evidence from which we could find that respondent's determinations are in error.  Regarding the fraud penalty, respondent has shown by clear and convincing evidence that petitioners' underpayments of 1989 tax were due to fraud.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.