Howard F. and Mildred E. KEOGH,
Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent-Appellee.

No. 81–7780.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 15, 1982.

Decided Aug. 17, 1983.

John L. Peterson, Butte, Mont., for petitioners-appellants.

Jonathan S. Cohen, Washington, D.C., for respondent-appellee.

Before DUNIWAY, SKOPIL and FLETCHER, Circuit Judges.

DUNIWAY, Circuit Judge:

In this case we review the tax court's finding of income tax deficiencies against a Las Vegas casino employee. The wife of the employee is a party solely because the two filed a joint return. We affirm.

## I. *Facts.*

Appellant husband here, petitioner in the tax court, was employed at the Dunes Hotel & Country Club, in Las Vegas. He worked in the casino, where he dealt blackjack or ran "big wheel" or roulette games and was known as a 21 dealer. The 21 dealers earned regular wages paid semimonthly. In addition, 21 players sometimes gave them tips or "tokes" in the form of coins or casino chips. Players often gave tokes to the dealers directly; at other times, they placed bets for the dealers, with a player determining after a winning bet how much of the winnings was the dealer's to keep.

The tax court found that during the years in question, 1969–1971, all 21 dealers at the Dunes pooled their tokes, and that the pool was divided equally once a day among all the dealers who had worked during that day's three shifts. Dealers who were off work sick for more than three days in a row were paid $20 off the top of the pool, but dealers who worked as temporary supervisors, or "floormen," did not share in the tokes. During the years in question, the dealers earned annual wages ranging from $5,946.52 to $9,113.79. They reported to their employer total annual toke incomes ranging from $632.50 to $1,022.60, and the reported amounts were shown on the employer's W–2 forms and on the dealers' tax returns.

The Commissioner asserted that the Keoghs had underreported tip income in 1969, 1970, and 1971. He calculated Keogh's toke income through a statistical analysis based on entries in a diary kept by one John Whitlock, Jr., not a party to this action, who worked at the Dunes from March 4, 1967 to May 7, 1970. In the diary, the date of the month and the day of the week were listed on the left side of each page, and separate vertical columns were designated "gross," "net," "tax," and "tips."

Beginning in January, 1968, there was an additional column designated "F.I.C.A.," and beginning in April, 1969, a further column designated "insurance." Wage entries were made in the notebook approximately every two weeks in amounts that were the same as those in the Dunes' payroll records for Whitlock. An entry of "off," "sick," "vac," or a dollar amount was made in the diary in the "tips" column for each day.

The Commissioner's statistical analysis of the tip entries resulted in an average daily toke income per dealer of between $42.04 and $74.24, depending on the year and the day of the week. For days on which Whitlock and Keogh both worked, the Commissioner's estimate for him reflected the diary figure. The appropriate average daily toke entry was used for days worked by Keogh but not by Whitlock. Finally, the Commissioner reduced his total estimated toke income for Keogh by 10 percent to account for variability in statistical projections.

There were some problems in the Commissioner's analysis. First, Whitlock's diary did not cover the entire period for which the Commissioner alleged income deficiencies in Keogh's reported tokes; the Commissioner's calculations for part of 1970 and for all of 1971 were extrapolations of the amounts Whitlock entered in previous years. Second, Whitlock did not work as a 21 dealer for the entire period covered by his diary; he first was a craps dealer before he switched to 21. It is undisputed that craps dealers generally made more in tokes than 21 dealers, and that craps dealers did not share their tokes with 21 dealers. It is unclear, however, when Whitlock switched from craps to 21. Third, as the tax court found, the Commissioner's analysis did not reflect consultations with any gaming industry experts outside the I.R.S. and did not consider factors such as the economy, type of game, limits on amounts that could be bet for dealers, amount of money bet, percentage won by the Dunes, season of the year, or holiday periods. Fourth, it is undisputed that Whitlock had, as the tax court found, "a poor reputation for honesty and truthfulness," was dismissed by the Dunes

for unsatisfactory work, and had been convicted, with his wife, of receiving stolen property. Despite the larger amounts entered in his diary, he reported total toke income of $419 in 1968, $382 in 1969, and $58 from January through April of 1970.

At trial before the tax court, the principal evidence was a photocopy of the Whitlock diary and testimony by Barbara Mikle, by then Whitlock's former wife. Whitlock, though subpoenaed by the Commissioner, failed to appear. Keogh claimed that he had recorded his daily toke income, but had thrown the records out monthly after reporting toke income to the Dunes each month.

The tax court issued a memorandum findings of fact and opinion on August 17, 1981. Essentially, it accepted the Commissioner's analysis, but reduced the tax deficiency the Commissioner had asserted against Keogh by approximately 20 percent. The tax court found that the Keoghs owed in additional taxes $2,050.52 for 1969, $1,757.46 for 1970, and $1,672.10 for 1971.

## II. Evidential Issues.

### A. Hearsay.

■ The Whitlock diary, offered in evidence to prove the truth of its contents as they related to tokes received by Dunes 21 dealers, was hearsay and thus inadmissible unless excepted by one or more rules of evidence. F.R.Evid. 801, 802. In admitting the diary, the tax court cited the exceptions contained in Rules 803(6) and 804(b)(3). Because we find the diary admissible under Rule 803(6), we do not address the 804(b)(3) exception.

Rule 803(6), the "business records" exception to the hearsay rule, permits the admission of

A ... record, ... in any form, of acts [or] events, ... made at or near the time by, ... a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record, ... all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, ... occupation, and calling of every kind, whether or not conducted for profit.

We hold that the tax court did not abuse its discretion in admitting the diary in evidence. *United States v. Perlmuter,* 9 Cir., 1982, 693 F.2d 1290, 1293.

■ The Keoghs' first argument is that Rule 803(6) does not apply to the diary because it was not a business record. They argue that the diary was Whitlock's personal record, not a record of the business enterprise involved, the Dunes. But Whitlock's diary, even though personal to him, shows every indication of being kept "in the course of" his own "business activity," "occupation, and calling." *See* 4 Weinstein's Evidence ¶ 803(6)[03] (1981 ed.) at 803–155: "[P]ersonal records kept for business reasons may be able to qualify. A housekeeper's records kept neatly and accurately for purposes of balancing bank statements, keeping strict budgets and preparing income tax returns could qualify under the statute."

The reliability usually found in records kept by business concerns may be established in personal business records if they are systematically checked and regularly and continually maintained. *See United States v. Hedman,* 7 Cir., 1980, 630 F.2d 1184, 1197–1198 (diary of payoffs by extortion victim); *United States v. McPartlin,* 7 Cir., 1979, 595 F.2d 1321, 1347–1350 (desk calendar-appointment diary, and cases there cited); Weinstein, *supra,* (reliability determined from "testimony indicating that they were kept meticulously"); Advisory Committee Note to Rule 803(6). *But see Buckley v. Altheimer,* 7 Cir., 1946, 152 F.2d 502, 507–508 (private financial diary inadmissible, distinguished from "account books or individual memoranda of particular transactions"), a case decided before the adoption of the Federal Rules of Evidence.

■ Here, Mikle testified that she saw Whitlock and only Whitlock make entries in the diary; that he usually made them after

night shifts of work; that when he made no entries for three to four days, he would copy entries for those days from a record kept in his wallet; that he usually made no entries in the diary on his days off; and that she understood the diary to contain a record of tokes he received from his work as a dealer.

The cases that the Keoghs cite for the proposition that Rule 803(6) applies only to commercial business records that are kept by those under a business duty to do so arose in the commercial context, but in fact stress just the sort of timeliness and regularity of entries that are present here. *See, e.g., United States v. Kim,* D.C.Cir., 1979, 595 F.2d 755, 759–764 (telex prepared in response to subpoena and summarizing two-year-old bank deposits not admissible); *Seattle-First National Bank v. Randall,* 9 Cir., 1976, 532 F.2d 1291, 1296 (bank's loan procedure manual not admissible).

More to the point is *Sabatino v. Curtiss National Bank of Miami Springs,* 5 Cir., 1969, 415 F.2d 632, reversing a trial court's refusal to admit in evidence a personal check record. That case construed the Federal Business Records Act, 28 U.S.C. § 1732, but its reasoning is instructive here. *United ed States v. Smith,* 9 Cir., 1979, 609 F.2d 1294, 1301. The *Sabatino* court said, "A man has a direct financial interest in keeping accurate accounts in his personal business. * * * The cases indicate that private records, if kept regularly and if incidental to some personal business pursuit, are competent evidence under § 1732." 415 F.2d at 636. It made no difference whether the check account was used for any specific business. *Id.* at n. 5. "Moreover, it is settled that the business 'need not be commercial.'" *Id.,* citing C. McCormick, Evidence § 283 (1954).

■ The Keoghs dispute the general trustworthiness of the diary entries. They cite *Palmer v. Hoffman,* 1943, 318 U.S. 109, 113–114, 63 S.Ct. 477, 480–481, 87 L.Ed. 645, alleging that Whitlock's motives in preparing the diary were never explained. *Palmer v. Hoffman* is not in point because there is no evidence that Whitlock's motives in making the entries were suspect. The diary contained his own personal financial records; there is no reason put forward for him to have lied to himself. The reliability of the tip entries is corroborated by the fact that other entries corresponded with Dunes' payroll records, and that reliability is not tarnished by the fact that Whitlock, as the Keoghs are alleged to have done, reported to the government smaller amounts of tip income than he in fact received and recorded in the diary. Neither is Rule 803(6) made inapplicable by the fact that Mikle, not Whitlock, testified to lay the foundation for the diary. She testified adequately as to the regularity of the entries. *See United States v. Smith, supra,* 609 F.2d at 1301–1302.

■ The Keoghs contend that the testimony of Whitlock as custodian of the diary was required because only he could speak to his reliance on the records kept there. But the record gives us no reason to believe that Whitlock did not rely on his personal financial diary; therefore, we do not find that the tax court abused its discretion in admitting it without Whitlock's personal testimony.

### B. Best evidence.

■ The Keoghs' second argument regarding the Whitlock diary is that the tax court violated F.R.Evid. 1002, the "best evidence rule," in admitting in evidence the photocopy of the diary. Rule 1003 permits the admission of a photocopy "duplicate," such as the copy submitted here, "unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." The Keoghs contest the tax court's determination that there was no genuine question raised as to the authenticity of the original. They miss the point by arguing that Mikle's testimony failed to prove the source of the tip income entries. The question is whether the diary of which the photocopy was a duplicate was in fact the diary Whitlock kept. No one disputes that.

### C. *Rule 403 prejudice.*

The Keoghs also argue that the probative value of the diary does not outweigh its unfair prejudicial effect, and therefore it should have been excluded under F.R.Evid. 403. They point to Whitlock's established poor reputation for truth-telling, and the fact that Whitlock reported tip income amounts substantially less than the totals reflected in his diary. In particular, the Keoghs complain of their lack of opportunity to cross-examine Whitlock. Their argument here does not go to "unfair prejudice" within the meaning of Rule 403, which means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Note, Rule 403. The tax court took Whitlock's reputation and the lack of cross examination into account in weighing the value of the diary. It did not abuse its discretion.

### D. *Denial of due process.*

Finally, the Keoghs argue that their inability to cross-examine Whitlock was a denial of due process, considering the importance of Whitlock's diary to the case. They say that questioning would have resolved the uncertainty as to when Whitlock switched from working the craps tables to dealing 21, would have established whether the "tip" income recorded in the diary actually came solely from Whitlock's work as a dealer, and would have established whether Whitlock kept the diary for business or personal reasons.

Although the Keoghs criticize the Commissioner for not deposing Whitlock before trial, they too failed to depose Whitlock, apparently assuming, as did the government, that Whitlock would obey the subpoena to testify. By itself, the lack of opportunity to cross-examine the declarant of an otherwise admissible hearsay statement is not a denial of due process. *See Chambers v. Mississippi,* 1973, 410 U.S. 284, 298–299, 93 S.Ct. 1038, 1047–1048, 35 L.Ed.2d 297. Here, notwithstanding Whitlock's failure to testify, his diary was admitted "under circumstances that tend[ed] to assure reliability and thereby compensate for the absence of the oath and the opportunity for cross-examination." *Id.* at 299, 93 S.Ct. at 1047. The tax court's 20-percent reduction in the amount of tax alleged to be owed took sufficient account of the uncertainties as to the diary.

## III. *Merits.*

### A. *Burden of proof.*

We have repeatedly said that (1) the Commissioner's initial determination that a taxpayer has received unreported income is presumptively correct, (2) the taxpayer has the burden of overcoming this presumption by a preponderance of the evidence, and (3) when a taxpayer has overcome the presumption by competent and relevant evidence, the presumption disappears and drops out of the case. Thus, the burden of proving the deficiency reverts to the government. *United States v. Stonehill,* 9 Cir., 1983, 702 F.2d 1288, 1294; *Karme v. C.I.R.,* 9 Cir., 1982, 673 F.2d 1062, 1065; *Herbert v. C.I.R.,* 9 Cir., 1966, 377 F.2d 65, 69. The rule is different where claimed deductions are involved. As to these, the taxpayer has the ultimate burden. *Rockwell v. C.I.R.,* 9 Cir., 1975, 512 F.2d 882, 886.

### B. *Unreported income.*

The tax court holding that certain sums were due was a finding of fact, and as such, is "not [to be] overturned unless [it is] 'clearly erroneous,'" *Weimerskirch v. C.I.R.,* 9 Cir., 1979, 596 F.2d 358, 359, citing *Rockwell v. C.I.R.,* 9 Cir., 1975, 512 F.2d 882, 884. "A finding is clearly erroneous when this court is 'left with the definite and firm conviction that a mistake has been committed.'" *Weimerskirch, supra,* 596 F.2d at 359–360, citing *C.I.R. v. Duberstein,* 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218.

The Keoghs argue that the toke totals that they reported to the Dunes were based upon records clearly reflecting their income, as required by § 6001 of the Internal Revenue Code. The Keoghs contend that the tax court erred in rejecting their

testimony in favor of income projections derived from the Whitlock diary. But the tax court did not rely solely on the diary in finding that the Keoghs did not correctly report their income. It relied also on its findings that the daily toke income they reported was too small an amount to have caused the elaborate sharing arrangement among the dealers and to have triggered objections by dealers to sharing their tokes with other dealers acting as temporary floormen, and was inconsistent with the dealers' donation of $20 a day in tokes to dealers off work sick. Tax Court memo at 25–26. The tax court is not obliged to believe a taxpayer's testimony rather than evidence introduced by the Commissioner, *see Grudin v. C.I.R.*, 9 Cir., 1976, 536 F.2d 295, 296; *Potts, Davis & Co. v. C.I.R.*, 9 Cir., 1970, 431 F.2d 1222, 1225–1226; and we are not persuaded that the tax court incorrectly disbelieved Keogh.

The Commissioner, therefore, was empowered to devise a method that clearly reflected the Keoghs' toke income. Internal Revenue Code § 446(b). The Commissioner estimated toke income through a statistical analysis relying on the Whitlock diary. The tax court reduced that estimate of the tax liability by about 20 percent. It did so because of several factors, including the Keoghs' inability to cross examine Whitlock, uncertainty as to when Whitlock's work shifted from the craps table to the 21 table, the inappropriateness of fitting all the data from the statistical analysis "into single straight lines," and the probability that projections of toke income after the last diary entry were less reliable than earlier ones. While these factors were cause to reduce the Commissioner's estimates, the court correctly found that they were "not of such magnitude or such nature 'that the commissioner's determination [is] shown to be without rational foundation,'" citing *Helvering v. Taylor*, 1935, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623.

It is argued that the Commissioner's analysis is arbitrary and the amount of tax liability is excessive because his estimate failed to take into account the economy, holidays, and various shifts worked. Each

of those factors should have been reflected, however, in the Whitlock diary. Moreover, the fact that dealers worked different shifts is of no consequence, because dealers from all three shifts pooled their tokes for equal division at the end of each day.

It is further argued that because the tax court reduced the Commissioner's approximation of tax due, it implicitly rejected the Commissioner's analysis because it led to excessive results. Thus, it is argued, the Commissioner's estimate shed its presumption of correctness. But the Keoghs offer no evidence except their own self-serving testimony that the Commissioner's estimation was excessive. To adopt their theory "would be tantamount to holding that skillful concealment of income by failure to keep records and destruction of the original documents from which income could be reconstructed would be an invincible barrier to proof." *Mitchell v. C.I.R.*, 7 Cir., 1969, 416 F.2d 101, 102. The tax court may reevaluate the evidence and reach its own findings. *Id.* It properly did that here.

Affirmed.