114 F.3d 1194
 79 A.F.T.R.2d 97-2844, 97-2 USTC P 50,497
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Bill McDONALD and Richard D. Maynard, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 96-70333.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 13, 1997.
Decided May 23, 1997.
 
 1
 Appeal from the United States Tax Court, Nos. 14892-91, 14893-91, 13119-92, 13120-92; Carolyn Miller Parr, Judge, Presiding.
 
 
 2
 BEFORE: O'SCANNLAIN and NOONAN, Circuit Judges, and RHOADES,** District Judge.
 
 
 3
 MEMORANDUM*
 
 
 4
 Petitioners Bill McDonald and Richard Maynard appeal the tax court's decision affirming, with some modifications, deficiencies and additions to tax imposed by the Commissioner for the tax years 1987 and 1988. The tax court held that the Petitioners had unreported income, that the Petitioners' claimed deductions were not allowable, and that the Petitioners are liable for additions to tax for fraud and substantial understatement of taxes. We affirm in part and remand in part.
 
 Background
 
 5
 Petitioners are certified public accountants with more than 60 years of accounting experience between them. The Petitioners are partners in the Maynard and McDonald partnership ("M & M") M & M's business consists of preparing tax returns, assisting clients in tax-related matters, providing accounting services, and representing clients during audits by the IRS. McDonald, who is a licensed attorney, also files petitions in tax court on behalf of clients.
 
 
 6
 In 1981, after the Petitioners had each filed for bankruptcy, the Petitioners created Gold Country Financial, Inc. ("GCF"). GCF was incorporated by Maynard's friend, Terry Feil, who became GCF's president and sole shareholder. GCF was formed to separate the Petitioners' professional income and to shield their income from creditors. The business of GCF was essentially coextensive with that of M & M. The two entities shared the same office.
 
 
 7
 The accounting and recordkeeping methods employed by M & M and GCF were mysterious indeed. M & M's records for the tax periods at issue consisted of two single sheets of paper which purportedly reflected M & M's income on a monthly basis. M & M had no business checking account. M & M sent billing statements to some (but not all) of its clients for services rendered, but any such billing statements were discarded after payment was received. M & M did not keep a cash receipts journal, a cash disbursements journal, a general journal, purchase invoices, client ledger cards, or even a client list.
 
 
 8
 GCF's recordkeeping was not much better. GCF maintained a bank account at Merchants National Bank. Although GCF kept a cash disbursements journal and a ledger showing year-end entries to income based on deposits into the Merchants account, GCF did not keep a cash receipts journal, an accounts receivable list, or a client list. The billing statements of GCF were also discarded after payment was received.
 
 
 9
 Revenue Agent Pease audited the Petitioners' 1987 and 1988 federal income tax returns. The Petitioners' cooperation during the audit was not forthcoming. The Petitioners provided Agent Pease with the two summary sheets of paper only, with no supporting documentation with which Pease could verify the monthly income figures listed on the summaries. To determine whether the Petitioners had unreported income, Pease obtained from the Internal Revenue Service Center a list of returns that were prepared by M & M or GCF. Pease contacted the Petitioners' clients identified in this way and asked them for copies of billing statements and cancelled checks for services performed by the Petitioners. Pease used the client responses to reconstruct the Petitioners' income. Where no response was received, Pease made certain assumptions and estimates to determine income. For example, Pease included as income the amounts that clients deducted for tax return preparation. Where Pease had nothing more than a tax return prepared by M & M or GCF, Pease assumed a fee of $250, which Pease obtained from a rate sheet provided by one of the Petitioners' clients.
 
 
 10
 Through the client responses, Pease discovered that GCF maintained a bank account at the Bank of Lodi. The Petitioners did not disclose the Bank of Lodi account to Pease, nor did the Petitioners inform Terry Feil about the Bank of Lodi account. Deposits into the Bank of Lodi account consisted of client payments and were not included as income on GCF's returns. The record reveals no consistency regarding the use of the Merchants account and the Bank of Lodi account. Some client checks written to GCF were deposited into the Merchants account and some were deposited into the Bank of Lodi account. Some client checks written to M & M were deposited into the Merchants account and some were deposited into the Bank of Lodi account. Some checks were simply cashed. During the tax periods at issue, checks written to the Petitioners on the Bank of Lodi account amounted to more than $100,000.
 
 
 11
 Based on Pease's income reconstruction, the Commissioner determined deficiencies in the Petitioners' taxes and asserted additions to tax for fraud and substantial understatement of tax.
 
 Discussion
 
 12
 We review decisions of the United States Tax Court on the same basis as decisions in civil bench trials in United States District Court. Condor Int'l, Inc. v. Commissioner, 78 F.3d 1355, 1358 (9th Cir.1996); Kelley v. Commissioner, 45 F.3d 348, 350 (9th Cir.1995); Ball, Ball & Brosamer v. Commissioner, 964 F.2d 890, 891 (9th Cir.1992). Thus, the tax court's conclusions of law are reviewed de novo. Condor Int'l, 78 F.3d at 1358; Kelley, 45 F.3d at 350; Ann Jackson Family Found. v. Commissioner, 15 F.3d 917, 920 (9th Cir.1994). Factual findings are reviewed for clear error. Condor Int'l, 78 F.3d at 1358; Kelley, 45 F.3d at 350.
 
 
 13
 A. The Tax Court Did Not Commit Clear Error In Finding That The Commissioner's Deficiency Determination Should Be Accorded A Presumption Of Correctness Because The Commissioner's Determination Had A Rational Foundation
 
 
 14
 "The Commissioner's method of calculating ... income is presumptively correct and will be affirmed as long as it is rationally based. The taxpayer has the burden of proving the Commissioner's method to be wrong." Cracchiola v. Commissioner, 643 F.2d 1383, 1385 (9th Cir.1981) (citation omitted). "Whether a rational foundation for deficiency determination exists is a factual question; the tax court's findings can only be overturned on a showing that they are clearly erroneous." Edelson v. Commissioner, 829 F.2d 828 (9th Cir.1987); accord United States v. Stonehill, 702 F.2d 1288, 1295 (9th Cir.1983), cert. denied, 465 U.S. 1079 (1984).
 
 
 15
 The Petitioners do not dispute that the Commissioner was entitled to reconstruct the Petitioners' income using some means other than the information provided by the Petitioners, nor do the Petitioners dispute that the Commissioner introduced "some substantive evidence" of the Petitioners' unreported income. Delaney v. Commissioner, 743 F.2d 670, 671 (9th Cir.1984). Instead, the Petitioners criticize Pease's use of estimates and assumptions in reconstructing the Petitioners' income. Where the clients contacted by Pease did not provide documentation of fee payment, Pease made assumptions based on the return preparation deductions or on the Petitioners' rate schedule. As the Petitioners point out, there is no way to confirm when and whether the fees were actually billed or collected by the Petitioners. These matters would be relevant because GCF used the accrual method of accounting, whereas M & M used cash receipts accounting. Moreover, the two entities had different tax reporting periods.
 
 
 16
 Even if Pease's reconstruction did not produce results that could be harmonized with GCF's and M & M's accounting and reporting methods, there is no reason to conclude from this fact that the income reconstruction was arbitrary or without a rational foundation. This court has often approved the Commissioner's use of estimates, assumptions, extrapolations, and the like in calculating a taxpayer's income. See, e.g., Spatafore v. United States, 752 F.2d 415, 418-19 (9th Cir.1985); Adamson v. Commissioner, 745 F.2d 541, 547-48 (9th Cir.1984); Keogh v. Commissioner, 713 F.2d 496, 498-502 (9th Cir.1983); Dark v. United States, 641 F.2d 805, 806-08 (9th Cir.1981); Schildcrout v. McKeever, 580 F.2d 994, 996-99 (9th Cir.1978). Moreover, the Petitioners should not be heard to complain that Pease failed to consider accrual versus cash receipts accounting because there was no way for Pease to consider accrual--the Petitioners discarded any billing statements or client invoices that could have been used to determine income accrual. Finally, Pease was certainly reasonable to assume that the Petitioners' clients actually paid for services rendered even though a cancelled check or bank deposit did not document the payment. The Petitioners stipulated to the fact that some client payments were never deposited, but were simply cashed.
 
 
 17
 The Petitioners also argue that the Commissioner's and the tax court's failure to adequately allocate bank deposits to GCF resulted in an excessive deficiency with respect to the Petitioners. The Petitioners' many calculations to make this point, however, are of no moment. As the Commissioner points out, the bank deposits were allocated entirely to GCF, not to the Petitioners. It was the checks drawn on GCF's accounts and payable to the Petitioners that were treated as income to the Petitioners, and the Petitioners do not suggest any rational basis for finding that the checks did not constitute income to them.
 
 
 18
 Contrary to the Petitioners' arguments, treatment of the checks drawn on the GCF account as income to the Petitioners did not contradict the tax court's opinion, nor did such treatment result in unacceptable double taxation. Before the tax court, the Commissioner argued that client fee income should be allocated equally between Maynard and McDonald, despite the fact that the amounts reported by the Petitioners on their returns varied substantially from a 50-50 split. The tax court rejected the Commissioner's argument and found that the Petitioners' oral partnership agreement provided for the unequal sharing of client fee income. Hence, the Commissioner's computations for the entry of decision did not disrupt the Petitioners' unequal reporting of income and, instead of allocating the checks drawn on the GCF accounts equally between the Petitioners, the Commissioner treated the checks to Maynard as income to Maynard and the checks to McDonald as income to McDonald. This treatment was consistent with the tax court's opinion, not contrary to it.
 
 
 19
 The argument that attributing the checks as income to the Petitioners constituted double taxation is meritless. The Petitioners seem to suggest that because deposits into the GCF accounts constituted income to GCF, the checks drawn on the accounts cannot be income to the Petitioners because the Petitioners were neither employees or shareholders of GCF. But to sustain the Petitioners' argument would be to hold that channelling the fee income through the GCF accounts somehow made the income disappear. To the extent that the same dollars were taxed twice, that is the price that the Petitioners decided to pay when they funnelled the fee income through a corporation, rather than simply through the M & M partnership.
 
 
 20
 In the final analysis, the Petitioners' critique of the Commissioner's income reconstruction fails to establish that the asserted deficiencies were without a rational foundation. The Commissioner used the "best available means of assessment" given the Petitioners utter lack of adequate recordkeeping. Dark, 641 F.2d at 808. The tax court did not err in finding that the Commissioner's deficiency determination had a rational foundation and was to be accorded a presumption of correctness.
 
 
 21
 B. The Tax Court Did Not Commit Clear Error In Determining That McDonald Had Other Unreported Income
 
 
 22
 McDonald contests the tax court's finding that the certain unexplained funds used by McDonald during the periods at issue derived from a taxable source of income. Specifically, McDonald challenges the tax court's findings with respect to the funds used to purchase a $1,912 cashier's check and deposits made to the M & B Investment Club Account ("M & B Account"). As discussed above, the Commissioner's determination was presumptively correct because evidence was introduced showing that the Petitioners had unreported income. Hence, the Petitioners bore the burden of establishing that unexplained funds came from a non-taxable source. Delaney, 743 F.2d at 671-72 (taxpayer failed to demonstrate that funds used to purchase gold coins came from non-taxable source). Again, the tax court's conclusion that tax was due from McDonald's unexplained funds will not be overturned absent a showing that the tax court's finding was clearly erroneous. Keogh, 713 F.2d. at 501.
 
 
 23
 McDonald testified that the funds used to purchase a $1,912 cashier's check came from Maynard's family and were used to fund a loan to the McIssac family. To begin with, the tax court correctly noted that, to the extent McDonald's testimony described how the cashier's check was used, the testimony was not helpful in determining whether the source of the funds used to purchase the cashier's check was taxable. Next, the tax court was certainly entitled to discredit McDonald's explanation that he merely acted as a conduit for funds originating with Maynard. Delaney, 743 F.2d at 672. The tax court's opinion reveals that the Petitioners' credibility was a significant issue in this case and, generally speaking, that the tax court found the Petitioners' testimony to be incredible. While McDonald's explanation may have been plausible, the explanation does not leave this court with the "definite and firm conviction that a mistake has been committed." Keogh, 713 F.2d at 501 (internal quotations omitted).
 
 
 24
 The tax court also found that funds used to make five deposits into the M & B Account came from sources that were taxable to McDonald. The source of the first two deposits was McDonald's daughter's tax refunds. The parties agree that these sums ($2,330 and $4,438) were not taxable to McDonald and were erroneously included in the deficiency determination. As the tax court apparently failed to observe the parties' stipulation as to these items, the tax court's decision must be recalculated to reduce McDonald's deficiency.
 
 
 25
 As to the other deposits to the M & B Account, McDonald presented no substantiating documentation to show that the source of the deposits were non-taxable. The evidence consisted of McDonald's, McDonald's daughter's, and McDonald's former wife's testimony that the funds did not belong to McDonald. It cannot be said that the tax court committed clear error in finding this testimony unpersuasive, given the relationship between the witnesses and McDonald and given McDonald's lack of credible substantiation.
 
 
 26
 C. The Tax Court Did Not Err In Disallowing Maynard's Claimed Deductions For Net Operating Loss Carryforwards And General Business Credit Carryforwards
 
 
 27
 "The taxpayer bears the burden of showing entitlement to a particular deduction." Norgaard v. Commissioner, 939 F.2d 874, 877 (9th Cir.1991). The tax court's determination that the taxpayer failed to adequately substantiate a deduction "is a finding of fact subject to reversal only if clearly erroneous." Id. Whether tax court correctly determined that a deduction was not allowable because the taxpayer failed to meet the "all events" test is a question law reviewable de novo. Challenge Publications, Inc. v. Commissioner, 845 F.2d 1541, 1543 (9th Cir.1988).
 
 
 28
 Between 1976 and 1980, Maynard was the general partner in each of three limited partnerships. The three limited partnerships operated a chain of submarine sandwich shops. The sandwich shops were financial failures and ceased operating by the end of February 1980. After some of the lessors and other creditors filed suits against the partnerships and the partners, Maynard filed for bankruptcy. For 1987 and 1988, Maynard claimed carryforward deductions for his share of the net operating losses and general business credits (or "investment tax credits") attributable to the sandwich shops. In total, Maynard's claimed deductions amount to $954,855. The bulk of this sum represents, according to Maynard, rents that accrued under the sandwich shop lease agreements by virtue of the acceleration clauses that became effective upon the default of the sandwich shop partnerships. The tax court disallowed the portion of the deduction claimed for rent, holding that the rents did not accrue under the "all events" test. The tax court disallowed the remainder of the deductions on the ground that Maynard failed to submit adequate substantiation of the losses.
 
 
 29
 1. The Tax Court Properly Disallowed The Deductions Claimed
 
 
 30
 For Rent Due Under The Sandwich Shop Leases
 
 
 31
 I.R.C. § 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Where allowable deductions exceed gross income, the resulting "net operating loss" may be carried forward to offset income during the fifteen years following the year in which the net loss is initially recognized. I.R.C. § 172. The Commissioner does not dispute that commercial rents constitute ordinary and necessary business expenses. Rather, the Commissioner disallowed the rent deduction on the ground that the rent liabilities never accrued. The tax court agreed with the Commissioner.
 
 
 32
 "[W]hether a business expense has been 'incurred' to permit its accrual for tax purposes is governed entirely by the 'all events' test." Challenge Publications, 845 F.2d at 1545. "Under the 'all events' test, two requirements must be satisfied in order for a deduction to be appropriate in any given year: (1) all of the events that bear on the fact of liability must have occurred, and (2) the amount of liability must be determinable with reasonable accuracy." Id. at 1543; see also I.R.C. § 461(a); Treas. Reg. § 1.461.1-1(a)(2).
 
 
 33
 Given that the sandwich shops were unable to meet their obligations and had ceased operating when the rent acceleration clauses became effective, and given Maynard's bankruptcy, the tax court found that Maynard "had no expectation that the creditors were going to be paid and, in fact, they were not" (emphasis added). In holding that the rent liabilities had not been incurred and, hence, that they were not deductible, the tax court relied on cases holding that the taxpayer must have a reasonable expectation that the obligation will be paid in order for a liability to be accruable. See, e.g., Putoma Corp. v. Commissioner, 66 T.C. 652, 660 (1976), aff'd, 601 F.2d 734 (5th Cir.1979); Helvering v. Russian Fin. & Constr. Corp., 77 F.2d 324, 327 (2nd Cir.1935). Maynard argues that the tax court erred in applying a "reasonable expectation of payment" requirement to the all events test. We disagree. Recognizing that the tax laws are primarily concerned with realized gains and losses, it has long been established in this circuit that an obligation, even though fixed and unconditional, cannot be accrued for tax purposes absent a reasonable expectancy that the obligation "will be converted to money or its equivalent." H. Liebes & Co. v. Commissioner, 90 F.2d 932, 937-39 (9th Cir.1937); see also Flamingo Resort, Inc. v. United States, 664 F.2d 1387, 1389 (9th Cir.), cert. denied, 459 U.S. 1036 (1982); Stephens Marine, Inc. v. Commissioner, 430 F.2d 679, 684 (9th Cir.1970).
 
 
 34
 Even were we to agree with Maynard that a reasonable expectation of payment is not determinative of whether a liability has been incurred, we nevertheless find that the rent deductions were properly disallowed. In relation to the cases where the reasonableness vel non of the taxpayer's expectation of payment is thought dispositive, this case stands on an entirely different footing. Here, the tax court found that by the time that the rent acceleration clauses became effective, Maynard had no expectation that the obligations would ever be paid. This factual finding is clearly supported in the record. The sandwich shop partnerships were insolvent and Maynard was bankrupt. Moreover, the facts that the rent obligations were not set up on the partnership books, that the partnerships never resumed operations and filed no returns following the 1980 taxable year, and that Maynard never treated the rents as an ongoing liability until his current tax problems arose, all suggest that Maynard not only did not expect that the liability would not be paid, but that he had no intention of ever paying the rents. Under these circumstances, i.e., where there is no likelihood or expectation that the obligation will be paid, the obligation should not be treated as a fixed and accruable liability for two reasons.
 
 
 35
 First, it strains logic, to the point where the accrual method must give way, to treat an obligation that will never be paid as a "fixed liability". As the tax court reasoned in World Airways, Inc. v. Commissioner, 62 T.C. 786, 804 (1974), aff'd 564 F.2d 886 (9th Cir.1977), such a liability is better thought of as nonexistent. Accord Kellogg v. United States, 179 B.R. 813, 817 (N.D.Tex.1994), aff'd, 82 F.3d 413 (5th Cir.1996). The second reason is that accrual of a liability for which no prospect of repayment exists does not clearly reflect income. This court has recognized the tension between financial and tax accounting methods: "It is ... well established that reasonable accounting methods which clearly reflect income for accounting purposes ... are often impermissible under the tax law." Challenge Publications, 845 F.2d at 1545-46. Here, it was certainly permissible for the Commissioner to disallow Maynard's claimed deductions attributable to the sandwich shop rents. Because the rent obligations were, in reality, never to be paid, deducting the rents as accrued losses mismatched expenses and revenue and resulted in something far less than a clear reflection of income. This is especially so with respect to Maynard personally, who appropriated a loss calculated under the accrual method, even though Maynard uses cash receipts and disbursements accounting, and even though Maynard had no intention of ever making good on the rent obligations. In sum, Maynard's claimed deduction for accrued rents was properly disallowed.
 
 
 36
 2. The Tax Court Did Not Clearly Err In Disallowing The
 
 
 37
 Remainder Of The Carryover Deductions And Credits
 
 For Lack of Substantiation
 
 38
 "The taxpayer ... has the duty to maintain records sufficient to establish the amount of deductions" Norgaard, 939 F.2d at 878. "The question of the amount of losses sustained by a taxpayer is a question of fact to be determined from the facts of each case, established by the taxpayer's evidence, and the credibility of the taxpayer and supporting witnesses. The credibility of the taxpayer is a crucial factor." Id. (citation omitted).
 
 
 39
 The tax court disallowed the remainder of Maynard's carryover deductions and credits because Maynard failed to substantiate the losses. The tax court found that Maynard's "books and records were incomplete and inadequate" with respect to the net operating losses and, as to the general business credits, the tax court found that Maynard failed to meet his burden because he "did not provide any invoices to support the purchase of qualified property upon which a credit could have been claimed. He did not provide supporting books and documents for purchases and sales."
 
 
 40
 Maynard argues that his documentary and testimonial evidence was sufficient to establish the deductions. As noted in Norgaard, 939 F.2d at 878, "[t]he argument is essentially that the tax court inadequately weighed the evidence before it." We cannot say that the tax court improperly discredited Maynard's evidence. As the Commissioner points out, Maynard's records, some of which were prepared after the fact, were not adequately supported with contemporaneous source documents such as purchase contracts, depreciation schedules, receipts, or cancelled checks. Furthermore, given Petitioners' general pattern of income concealment, the tax court was entitled to discredit the records and was entitled to discredit the testimony given with respect to the records by Maynard and by McDonald's daughter. In light of the record as a whole, the tax court did not commit clear error in denying Maynard's deductions for lack of substantiation.[1]
 
 
 41
 D. The Tax Court Did Not Err In Finding That McDonald's Filing Status Was As A Married Person
 
 
 42
 The parties agree that whether McDonald's nunc pro tunc divorce decree should be given effect for federal income tax purposes is a question of law reviewable de novo.
 
 
 43
 Petitioner McDonald and Mary Charles McDonald were married in 1948. Mary Charles filed a petition for dissolution of marriage and, on June 6, 1975, an interlocutory judgment of dissolution was entered in Los Angeles County, California. No further court action was taken until May 18, 1993 (less than two months before the tax court trial), when McDonald obtained a final judgment of dissolution. The Superior Court of California entered the final judgment of dissolution nunc pro tunc as of December 1, 1975.
 
 
 44
 For 1987 and 1988, McDonald claimed single filing status on his federal income tax returns. The Commissioner contended that McDonald should have filed as a married person and, as a consequence, determined deficiencies with respect to Social Security benefits. The Commissioner presented evidence that during the period between the interlocutory and final judgments of dissolution McDonald and Mary Charles lived together, held themselves out as married, and represented that they were married on certain legal documents. Based on this evidence, coupled with the fact that the final decree was sought only shortly before the tax trial, the tax court found that McDonald's delay in applying for a final divorce decree was intentional. Based upon this finding, the tax court held that for federal income tax purposes McDonald was a married person in 1987 and 1988.[2] We agree.
 
 
 45
 The tax court recognized that where federal tax liability turns on an issue of state law, federal authorities are not bound by a determination of the issue by a state trial court when the United States is not a party to the state proceeding, although the law of the state is controlling on the issue. Commissioner v. Estate of Bosch, 387 U.S. 456, 457, 465 (1967). Based on the tax court's finding that McDonald's delay in seeking the final divorce decree was intentional, which, based on the evidence described above, was not clearly erroneous, the tax court correctly held that the nunc pro tunc entry of the final decree was contrary to the law of California and should not be effective against the Commissioner. California Family Code § 2346 authorizes courts to enter final judgments of dissolution retroactively where the delay was caused by "mistake, negligence, or inadvertence." The court is aware of no California case law, and doubts that there is any, which holds that an intentional delay equates to mistake, negligence, or inadvertence. The tax court's resolution of this issue is affirmed.
 
 
 46
 E. The Tax Court Did Not Clearly Err In Finding That The Petitioners Are Liable For Additions To Tax For Fraud
 
 
 47
 "Review of a finding of fraud is a question of fact and such finding will be reversed only if clearly erroneous." Edelson, 829 F.2d at 832.
 
 
 48
 The Commissioner bears the burden of establishing fraud under I.R.C. § 6653 by clear and convincing evidence. Id. "Fraud under section 6653 is 'intentional wrongdoing on the part of the taxpayer with the specific intent to avoid a tax known to be owing.' " Id. at 833. "Because fraudulent intent is rarely established by direct evidence, this court has inferred intent from various kinds of circumstantial evidence." Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir.1986). "Such 'badges of fraud' ... include: (1) understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities." Edelson, 829 F.2d at 832.
 
 
 49
 The record in this case reveals sufficient evidence from which the tax court could properly conclude that the Commissioner had proved fraud by clear and convincing evidence. As summarized by the tax court:
 
 
 50
 Petitioners have extensive experience in income tax matters. Petitioner McDonald is a certified public accountant and an attorney with over 40 years of experience in accounting. Petitioner Maynard is a certified public accountant with over 20 years of experience in accounting. Petitioners prepare tax returns for clients and are aware that adequate information must be maintained to verify information on returns. In the instant case there was an abundance of circumstantial evidence of fraud, including several of the traditional "badges of fraud", such as underreporting of income, failure to keep proper books and records, failure to produce many records during discovery, failure to disclose the existence of bank accounts, and failure to cooperate with respondent's agent during the examination.
 
 
 51
 The tax court's finding of fraud is affirmed.
 
 
 52
 F. The Petitioners Waived Their Arguments Regarding Additions To Tax For Substantial Underpayment Of Taxes
 
 
 53
 The tax court sustained the Commissioner's additions to tax for substantial understatement of income tax under I.R.C. § 6661. Absent exceptional circumstances, an appellate court will not consider arguments not raised before the tax court. Monetary II Ltd. Partnership v. Commissioner, 47 F.3d 342, 347 (9th Cir.1995); Wilcox v. Commissioner, 848 F.2d 1007, 1008 n. 3 (9th Cir.1988). The Petitioners did not argue in the tax court that the additions to tax under § 6661 were inapplicable. As the Petitioners have offered no justification for their failure to challenge the § 6661 additions to tax in the tax court, the Petitioners are deemed to have waived any such arguments now made.
 
 Conclusion
 
 54
 The decision of the tax court is affirmed except with respect to the tax refunds deposited into the M & B Investment Club Account. The case is remanded to the tax court for recomputation of its decision to reflect the reduced deficiency with respect to the tax refund deposits.
 
 
 
 **
 The Honorable John S. Rhoades, Senior United States District Judge for the Southern District of California, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Maynard also argues that the tax court erred by requiring proof that Maynard did not absorb the carryover losses in the years between 1980 and 1987. It is clear from the tax court opinion that this reason for disallowance was in addition to the lack of substantiation. Because the tax court did not clearly err in finding a lack of substantiation, we do not reach Maynard's argument regarding absorption of the losses
 
 
 [2]
 Pursuant to I.R.C. § 7703, the determination of whether an individual is married is generally made at the close of the taxable year